[Crim. No. 35269. Second Dist., Div. Five. May 9, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT JONES, JR., Defendant and Appellant.

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Jack T. Kerry and John A. Saurenman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STEPHENS, Acting P. J.**—Defendant Albert Jones, Jr., was charged with the rape of Odessa H., a violation of Penal Code sections 261, subdivision 2 and 261, subdivision 3. It was further alleged that defendant acted voluntarily in concert with his brother, Kennedy Jones, in the above offense.

Defendant was also charged with three prior felony convictions. He pled not guilty and denied the priors. Subsequently the prior convictions were admitted.

On March 26, 1979, a trial by jury was commenced. The court denied defendant's motion pursuant to section 402 of the Evidence Code to exclude the prior inconsistent statements of a defense witness. The defendant was found guilty as charged and sentenced to state prison for a total of 10 years. He was given seven years for the rape conviction and an additional three years of enhancement due to the nature of his three prior convictions.

In his appeal, defendant challenges his conviction on two grounds. He contends that the admission into evidence of pretrial statements used

for substantive rather than impeachment purposes violated his right to confront the witness against him, pursuant to article I, section 15, of the California Constitution. Additionally, defendant asserts that these statements were inadmissible in that they were obtained through coercion.

## FACTS

Ms. Odessa H. (hereinafter Odessa or victim), the prosecuting witness, gave the following version of what occurred:

On the evening of October 16, 1978, Odessa was at the house of her friend, Trina Brown, in Los Angeles. At roughly 9 p.m. she called defendant and asked for a ride to her house in Long Beach. Defendant and his younger brother, Kennedy Jones, arrived at Brown's house and waited for the victim to meet them outside. Odessa took her place in the front seat of the car between defendant and his brother, Kennedy. Once on the road, defendant told Odessa that he was driving to his house. When he told her this, Odessa responded by stating that she wanted to go home, to which defendant answered that he was going to his house to pick up her cousin, Barry Johnson. During the course of their drive to defendant's home, defendant remarked: "When my dick get hard, you know what that mean." Odessa then said that she did not know what that meant, to which defendant replied, "You know when my dick get hard, you know that I want some." Odessa retorted that she would put up a struggle before letting defendant put a hand on her. The defendant thereupon replied, "Shit, you'll just going to have to put up a struggle." Odessa then told defendant, "I don't want to go to your house. I'd rather go home to Long Beach." Defendant responded, "No. We're going to pick up 'cuz' [her cousin]" and continued driving.

When defendant drove up to the house, he and his brother exited the car. Defendant then told Odessa to "[g]et out." Odessa refused but upon defendant's second demand, she left the car and walked to the house. Defendant again said that Odessa's cousin was in the house; however, when Odessa called out her cousin's name "Barry" there was no response. Then defendant said his "old lady," Brenda Boone (who was living with defendant at his house), was inside the house; yet when Odessa called out for Brenda, she heard no reply.

Odessa began walking towards the street—away from the house, but defendant grabbed her arms. She attempted to fend defendant off by

hitting him with her fists; however, this was to no avail. Defendant then called for Kennedy to grab her legs. Defendant and Kennedy then carried Odessa into the house and into the bedroom.

Kennedy held Odessa down as defendant took off her clothing. Defendant then removed his clothing and initiated sexual intercourse with Odessa. At this point he told Kennedy he could leave. Kennedy then left the room. When defendant ceased having sexual intercourse with Odessa, he called his brother who was in the next room, and asked him if he wanted to have sex with Odessa. Kennedy stated that he did not.

Odessa then left defendant's house and went to the home of a relative, a Mrs. Miles. Within one-half hour after leaving defendant's house, Odessa's cousin, defendant's sister, and defendant's father arrived at the Miles home. Later, as Odessa was getting into defendant's father's car, she saw defendant arrive. Defendant jumped into the car and started to hit her. According to Odessa, defendant said "he was going to kick my ass for lying on [sic] him." Odessa's cousin interceded for her, telling defendant to leave Odessa alone. Defendant then left the scene.

Odessa then drove with her cousin and defendant's sister to the residence of defendant's mother (this was not the home of defendant) where she discussed the incident with defendant's mother, Thereatha Jones. Odessa then returned home and it was not until the following day that she reported the incident to the police.

The aforementioned facts were all based upon the testimony of the prosecutrix, Odessa. Diametrically opposed to her testimony is the testimony of a key defense witness, Kennedy Jones, the 16-year-old brother of defendant. Kennedy testified that he was at his brother's house at approximately 9 p.m. on October 16, 1978. There was a telephone call from Odessa, and both defendant and Kennedy left the house to pick up the victim at the home of her girl friend. Contrary to the testimony of Odessa, Kennedy remembers that when they left, Brenda Boone was at defendant's house. Kennedy told of waiting for Odessa outside of her girl friend's house, Odessa's entry into the car, and their subsequent drive to defendant's house.

Kennedy's version of the events of that evening differs totally from Odessa's rendition from this point onward. When asked on the witness

stand about the conversation in the car as it was being driven to defendant's house, Kennedy recalled little, if any, meaningful conversation. When they arrived at the house, Kennedy remembered entering the house first, followed by Odessa and then defendant. They went into the living room, where defendant, Odessa and Ms. Boone smoked marijuana. The victim was said to have remained in that room for about 20 minutes during which time neither she nor defendant left. Twenty minutes after first entering the room, Odessa left the house, appearing to be in an angry mood. However, she had not arrived earlier at the house in an angry mood, and Kennedy does not remember anyone doing anything to make her angry.

Kennedy recalled seeing Odessa, his sister and Barry Johnson at his mother's house some 35 minutes after Odessa left defendant's house. From his bedroom, Kennedy overheard Odessa tell his mother that defendant had raped her and that he, Kennedy, held her down while this occurred. Kennedy did not say anything at the time because he was not part of the conversation.

On October 25, 1978, Kennedy was contacted at his home by Officer Morton Duff of the Los Angeles Police Department. Kennedy remembered being informed of his rights at his home and later being taken to his mother's home because he asked that she be present at his interrogation.[1]

After picking up Kennedy's mother, Officer Duff, his partner, Officer Elenitsky, Kennedy's mother, and Kennedy proceeded to the police station. At the station, with all parties present, the officers began to interrogate Kennedy. Kennedy claims he was not advised of his rights. He also denied any complicity in the rape. Kennedy recalled that his mother became upset and left the room within five minutes after the interview had begun. He also remembered being told by one of the officers that it would be easier on him if he told them what happened. Kennedy was then fingerprinted and photographed before he was permitted to leave. During the course of his cross-examination, Kennedy specifically stated that he did not carry Odessa, nor did he help anyone carry the victim into a house. Furthermore, Kennedy denied any involvement in, observation of, or knowledge of the alleged rape.

---

[1]At that time Mrs. Jones was in the process of moving and had two residences. Kennedy was staying at her new residence.

Further on in the trial, Kennedy acknowledged his previous testimony at the preliminary hearing. At that hearing he had admitted that the facts as stated in the police report were true; specifically that he helped the defendant rape Odessa. Kennedy attempted to exculpate himself from this inconsistency by explaining that he was scared. Among the reasons given for his apprehension, Kennedy recalled being told that they were going to lock him up.

The court permitted the prosecution to further challenge Kennedy's credibility by allowing into evidence the testimony of Officers Duff and Elenitsky.

Officer Duff testified that he interviewed Kennedy in the presence of his mother at the police station on October 25, 1978. The officer recounted that he told Kennedy's mother that Kennedy had been advised of his constitutional rights when he (Officer Duff) first encountered Kennedy at home. At her request, Officer Duff then readvised Kennedy of his rights at which point Kennedy said that he understood them. The officer remembered telling Kennedy that he knew for a fact that Kennedy and his brother picked up Odessa, drove to his brother's house, and when they arrived, she refused to leave the car. Officer Duff then told Kennedy to continue the story and, in so doing, to be mindful that they (the police) wanted the truth. Kennedy is said to have stated, "She wouldn't come in, so we picked her up and carried her in." Hearing this, Mrs. Jones said, "maybe Kennedy ought to have a lawyer." At this point, Officer Duff commented that "since Mrs. Jones no longer wanted us to talk to him [Kennedy],...we were going to book him." Mrs. Jones then said it would be permissible for the officers to continue to interview Kennedy. When Kennedy again admitted his participation in the victim's assault Mrs. Jones reportedly became extremely upset, as evidenced by her fits of screaming and crying. Accompanied by Officer Elenitsky, Mrs. Jones then left the interview room for some fresh air. However, before Mrs. Jones left the room, Officer Duff is said to have asked Mrs. Jones if he could continue questioning her son regarding the incident. Mrs. Jones said yes.

After Mrs. Jones left the interview room, Kennedy admitted both conspiring with defendant to get Odessa into defendant's house and helping defendant commit the rape.

Officer Elenitsky's version of Kennedy's interrogation was consistent with the testimony of Officer Duff. Officer Elenitsky recalled that Ken-

nedy admitted to carrying Odessa into the house and into the bedroom. Furthermore, he recalled Kennedy admitting having held the victim down while defendant prepared to rape her. Officer Elenitsky also remembered accompanying Mrs. Jones when she became distressed and left the interview room.

Compatible with the testimony of both Officer Duff and Officer Elenitsky is the testimony of Probation Officer Yarborough. Officer Yarborough testified that on December 12, some two months after the commission of the crime, he had a conversation with Kennedy in the presence of Kennedy's parents. Kennedy was informed of his constitutional rights and he waived them. According to Officer Yarborough, Kennedy told him that he and his brother picked up the victim from her girl friend's house and took her home to Long Beach. Kennedy and defendant then returned home. At this point in Kennedy's interview with Officer Yarborough, the officer began to feel that the boy was holding something back, so he asked Kennedy's parents to leave the room, which they did. Kennedy was then read the statement attributed to him in the police report previously prepared by Officers Duff and Elenitsky. Kennedy purportedly agreed with the report but asked Yarborough not to tell his parents.

At trial, Kennedy recalled speaking with Officer Yarborough at the juvenile justice center on December 12, 1978. Kennedy denied, however, having made any admissions relating to the Odessa incident.

The defense presented Mrs. Thereatha Jones, the mother of both Kennedy and defendant. Mrs. Jones testified that Kennedy was never advised of his constitutional rights in her presence, and that her son was sick with the flu.

Then there is the testimony of defendant admitting picking up the victim at the house of her girl friend and returning with the victim and his brother to his own house. However, defendant flatly denied raping Odessa. All he remembers was smoking marijuana with Odessa and he claims that Brenda Boone was in the room at this time.

The fourth major defense witness, Brenda Boone, testified that she was at defendant's house at 9 p.m. with the defendant and Odessa.

Previous statements made by Ms. Boone, wherein Ms. Boone stated that she was at her girl friend's house between the hours of 9 and 10

p.m. contradicted this testimony. The statements also suggested that when Ms. Boone left the house, Odessa was not present. Ms. Boone denied making the statements, yet she did acknowledge signing them; according to Ms. Boone, she did not read the paper she signed.

■ Defendant contends that the admission of testimony by Officers Duff and Elenitsky regarding Kennedy's extrajudicial confession as substantive evidence violated the confrontation clause of the state Constitution. Defendant asserts that Evidence Code section 1235 is unconstitutional.[2] This section sanctions the use of prior inconsistent statements in a trial to prove the truth of the matter asserted. Defendant predicates his position on the rationale of Justice Mosk's concurring opinion in *In re Johnny G.* (1979) 25 Cal.3d 543, 549-560 [159 Cal.Rptr. 180, 601 P.2d 196], to the effect that a conviction could not hinge on the admission of an unsworn, pretrial statement. This court rejects this proposition in light of the ruling in *People v. Chavez* (1980) 26 Cal.3d 334 [161 Cal.Rptr. 762, 605 P.2d 401].

In *Chavez* the Supreme Court dealt with the legal coexistence of Evidence Code section 1235 and article I, section 15, of the California Constitution.[3] That court concluded that "the state constitutional confrontation clause is not violated by the admission of a prior statement of a witness who testifies at trial and is subject to full cross-examination by the defendant at that time." (*Id.* at p. 339.)

The record indicates that both Officers Duff and Elenitsky testified as *witnesses against defendant at trial and* in so doing *were subjected to full cross-examination* concerning Kennedy's prior extrajudicial statements. Hence, it is manifest that his contention is meritless.

---

[2]Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a)   The witness was so examined while testifying as to give him an opportunity to explain or deny the statement; or

"(b)   The witness has not been excused from giving further testimony in the action."

[3]In relevant part, article I, section 15, of the California Constitution states: "The defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and *to be confronted with the witnesses against the defendant....*" (Italics added.)

In a similar vein, defendant maintains that the only feasible means of affording a defendant due process and a fair trial free from police perjury is to make corroboration of a declarant's extrajudicial statements, obligatory on the police.

Disposing of a similar argument the federal Court of Appeals held in *People* v. *Coades* (9th Cir. 1977) 549 F.2d 1303, that the failure of an FBI agent to record either electronically or stenographically the confession of a defendant was not grounds for suppressing the testimony of the confession. "The need for the rule suggested by appellant and the particular form such a rule should take are appropriate matters for consideration by Congress, not for a court exercising an appellate function." (*Id.* at p. 1305.)

The California Legislature considers corroboration of extrajudicial statements unnecessary in affording a defendant due process and a fair trial. The Legislature's reasoning is incorporated in the revision comments following Evidence Code section 1235.[4]

■ Defendant claims that the extrajudicial statements of Kennedy were made involuntarily and therefore were improperly admitted into evidence.

Defendant correctly asserts his standing to challenge the lower court's determination of the voluntariness of incriminatory statements made by Kennedy. (*People* v. *Gordon* (1978) 84 Cal.App.3d 913, 919 [149 Cal.Rptr. 91]. [This issue must be distinguished from that of the possible waiver or violation of Kennedy's *Miranda* rights, which defendant would have had no standing to question.] *Id.* at p. 919.)

---

[4]The comments to section 1235 provide in part as follows: "Section 1235 admits inconsistent statements of witnesses because the dangers against which the hearsay rule is designed to protect are largely nonexistent. The declarant is in court and may be examined and cross-examined in regard to his statements and their subject matter. In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation. The trier of fact has the declarant before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency. Hence, it is in as good a position to determine the truth or falsity of the prior statement as it is to determine the truth or the falsity of the inconsistent testimony given in court...."

■ Unlike the federal rule, in California the prosecution bears the burden of establishing beyond a reasonable doubt, that a confession was voluntary and not the result of any promise of leniency or reward. (*People v. Jiminez* (1978) 21 Cal.3d 595, 602, 609, 611 [147 Cal.Rptr. 172, 580 P.2d 672].) Applying this standard, this court is bound to independently examine the record to ascertain if the trial court's determination was well founded. (*People v. Jiminez, supra,* at p. 609; *People v. Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74].)

■ The main thrust of defendant's challenge concerns a comment made by Officer Duff while in the course of interrogating Kennedy. Kennedy's interrogation was primarily conducted by Officer Duff with assistance from his partner, Officer Elenitsky. At the time this essential comment was made by Officer Duff, Officer Elenitsky, Kennedy and his mother, Mrs. Jones, were present in the room. Officer Duff told Kennedy that he knew for a fact that Kennedy and the defendant picked up Odessa at her girl friend's house and drove her to defendant's house, where the victim refused to leave the car. Officer Duff then asked Kennedy to continue with the story as Kennedy perceived it from that point onward. Officer Duff qualified his request by making it clear that they (the police) were interested in only the truth. Allegedly, Kennedy continued the story by stating: "She wouldn't come in so we picked her up and carried her in." Officer Duff then recollects Mrs. Jones' statement: "Well, maybe Kennedy ought to have a lawyer." It was at this point that Officer Duff explained to Mrs. Jones, "that we were there trying to gather the facts, that we wanted nothing more than the truth, that her son Kennedy was—we believed was involved, and we were just trying to get at the truth. Since she had expressed her desire to have an attorney present, questioning would stop, and we were going to take the subject, place him under arrest and book him." According to Officer Duff, Mrs. Jones then told him that he could continue to ask questions of her son. Kennedy then is said to have incriminated both himself and defendant in stating that after he helped carry the victim into the bedroom, he held her down while defendant proceeded to rape her.

Here defendant argues that the officer's comment was, in essence, a threat to arrest Kennedy if he did not continue to talk, or, interpreted in another fashion, i.e., an offer of leniency or immunity from arrest in exchange for a confession. This court recognizes that the statements could possibly be construed as coercive, however, "the voluntary or involuntary nature of the statement 'does not depend upon the bare language

of the inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.'" (*In re Roger G.* (1975) 53 Cal.App.3d 198, 203 [125 Cal.Rptr. 625]; *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) Contrary to defendant's present position at trial Kennedy testified that he thought he was *already under arrest* at the time the interrogation took place. The effect of Kennedy's admission should necessarily negate any argument which presupposes that the fear of arrest resulted in Kennedy's confession. Further, there is other testimony by Kennedy, in which he denied being made any promises by the police in exchange for the "truth." Additionally, Kennedy denies being beaten, threatened with physical harm and hearing threats made to members of his family and close friends.

It has been stated that "[a] confession is voluntary when it is the product of a rational intellect and a free will." (*People* v. *Culver* (1973) 10 Cal.3d 542, 549 [111 Cal.Rptr. 183, 516 P.2d 887]; *Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]; *In re Roger G., supra,* 53 Cal.App.3d 198, 205.) Accordingly, by Kennedy's own testimony, any statements made by him in the interview which might amount to a confession were not the result of fear of arrest.

Despite Kennedy's admission, the defense urges this court to interpret the officer's statement as an example of psychological coercion: for example: "If you don't talk, we will arrest you." Defendant cites *In re Roger G., supra,* 53 Cal.App.3d 198, 202, in support of his contention.

"A confession is deemed involuntary and hence inadmissible if procured . . . by an express or implied threat that the failure to make a statement will result in consequences adverse to the suspect. [Citation.]"

*In re Roger G., supra,* typifies the case of the "coerced confession." There the minor persistently refused to confess and as the court noted: "While the interrogating officers used bare language informing Roger that they could not promise probation or parole, they made it crystal clear to him that he had no hope of anything other than incarceration if he did not confess. Worse, the interrogators sought to convey to the juvenile that as police, they had the power to determine whether he would be tried as an adult and possibly sentenced to the state prison for life, and that they would exercise the power if he did not admit his part in

the crime." (*Id.* at p. 203.) Kennedy's supposition that he had already been placed under arrest at the time of his interrogation negates the applicability of the rules expressed in *In re Roger G., supra.*

Within the defendant's above contention is the argument that police interrogation implicitly carries with it the notion of coercion. Naturally, each person has a different threshold or susceptibility to the same threat; thus, what might prove indicia of coercion in some, may not prove so in the minds of others. Carrying defendant's argument to its logical extreme, would permit any and all defendants the latitude to suppress any statement made in response to a police question, in that the fear of arrest exists whenever one suspected of criminal activity is questioned by the police.

As additional support for his contention, defendant cites *People* v. *Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206], which holds: "A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, *may* render an admission invalid." (Italics added.) Defendant asserts that if a threat by the police will render a suspect's confession involuntary and, hence, invalid, accordingly a threat to arrest the suspect right on the spot will invariably render his confession involuntary and invalid as well. Indeed, the threat of arrest made to a defendant *may* coerce a confession which is inadmissible; however, in the context of this case, this argument is frivolous. Kennedy expressly denied any knowledge of threats made either against himself or his family.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.