[Crim, No. 21586. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL TODD LEACH, Defendant and Respondent.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Harriet Wiss Hirsch and Kathleen Kahn, Deputy State Public Defenders, Gail R. Weinheimer and Melissa W. Johnson for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas Y. Shigemoto and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KAUS, J.*—Defendant Michael Todd Leach was convicted of one count of first degree murder (Pen. Code, § 187)[1] and of one count of robbery (§ 211). The jury found that Leach personally used a deadly weapon in the commission of the murder and robbery (§ 12022, subd. (b)). Special circumstance allegations that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)) and that the murder was committed while Leach was engaged in or was an accomplice in the commission of robbery (§ 190.2, subd. (a)(17)(i)) were found to be true. The judgment of death was entered under the 1978 death penalty law (§ 190.1 et seq.). The appeal is automatic. (Cal.Const., art. VI, § 11, § 1239, subd. (b).)

For reasons hereafter stated, we affirm the judgment of guilt and reverse the penalty.

## I. *Facts*

On October 11, 1979, Michael Messer's body was found in a fig orchard near Fresno. It had suffered 48 stab wounds. The prosecution's case, pre-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise indicated.

sented mainly by the testimony of friends of Leach who witnessed or participated in events just before and after the murder, painted the following picture.[2] On October 10, Messer, who was 17 years old, and friends pooled money for the purchase of hallucinogenic mushrooms and approached Leach. Leach arranged to sell Messer the drugs at Leach's apartment[3] at a specified later time. Leach then prevailed on his friends to rob Messer at the prescribed time.[4] Somehow, Messer escaped and, with funds ($600) intact, returned to his own apartment. Fifteen minutes later, Leach and Jones visited Messer to convince him to go ahead with the drug purchase. Despite warnings from his friends that he had been "set up," Messer returned to Leach's apartment. He brought along a knife that one of his friends had given him for self-protection.

In Leach's apartment, the three youths discussed the mushroom purchase. Messer was told it would take 30 to 45 minutes to set up the deal. He went back to his apartment, on the floor above, to wait. After Messer left, Leach told Linda that he and Jones were going to "take him out and beat the shit out of him" and take his money. Leach and Jones then left the apartment and drove, in a pickup truck owned by Jones' father, to the apartment of Eric Olson, one of the participants in the earlier attempted robbery.

There Leach told those present that he intended to take Messer out to the country, rob him, and kill him.[5] In return for $100 from the proceeds of the anticipated robbery, Michael Deseguirant agreed to help Leach carry out his plan. Deseguirant was to assume the role of a go-between in the purchase and, on his motorcycle, was to lead Messer, who would be with Leach and Jones, out to the country on the pretense of completing a drug purchase.

Leach and Jones returned to their apartment building to get Messer and brought him back to Olson's where he waited in the truck while Leach and Jones reentered Olson's apartment. As they left, Leach again told those present that he and Jones were going to rob and kill Messer. Witnesses testified that Leach was carrying a knife in a sheath inside his leather jacket.

Deseguirant testified that he led the truck to the outskirts as planned. He turned off at some point and watched as the truck went ahead for a short

---

[2]Fourteen witnesses were granted immunity before testifying.

[3]Leach, 18 years old, lived with 18-year-old Patrick Jones, 17-year-old Linda Grant, and Linda's 16-month-old child.

[4]Michael Western and Michael Deseguirant were to carry out the robbery. Eric Olson and Kevin Ohnstad were to drive them to Leach's apartment.

[5]Leach was known to have a "personal grievance" against Messer—Messer "had done something to [Leach's] sister."

distance and then pulled into a fig orchard. Deseguirant returned to Olson's apartment.

What happened at the fig orchard was related primarily by Linda Grant who had been given a detailed description by Jones and Leach. Linda testified that Jones told her that he and Leach faked engine trouble to give them an excuse to stop. While ostensibly waiting for help to arrive, the three began throwing knives at a tree stump. (There were only two knives—Leach's and Messer's. Apparently they took turns.) At some point, Jones picked up Messer's knife and hid it in his pocket. He then pretended to help Messer look for it. Leach told Linda that, shortly thereafter, Jones took Messer's knife out of his pocket and stabbed Messer in the back of the head or neck. Messer stood up "like on tiptoe, like it hit nerves or something." Leach began stabbing Messer from the front. Leach ordered Messer to give him the money. Messer complied, pleading, "There it is, don't kill me." Leach and Jones continued to stab Messer while Messer begged them to spare his life and promised not to turn them in. Messer eventually fell to the ground and Leach slit his throat.

About one and one-half to two hours after Deseguirant left them near the fig orchard, Leach and Jones arrived at Olson's apartment. Leach was covered with blood; Jones had blood on his hands. Leach announced only that they had stabbed someone and then the two went into the bathroom to wash up. When they had finished, Leach gave Deseguirant $80. He described to those present—a group which included Deseguirant, Western, and Olson—what had happened in the orchard; how he "stabbed [Messer] and stabbed him and stabbed him."

Leach then pulled out Messer's blood-stained knife and asked, "Does anybody want this?" Deseguirant took it and, later, turned it over to the police. Leach and Jones then left "to go get cleaned up and return the pickup truck."

Once back at his apartment, Leach, who still had blood on himself, pulled a wad of 20-dollar bills from his pocket and told Linda that he had killed Messer. Leach and Jones got "cleaned up." Leach, Jones, and Linda left the apartment with the blood-stained clothes and Leach's knife and got rid of the evidence in various ways.[6] It was during this excursion that the details of the murder and robbery were explained to Linda.

---

[6]One pair of slacks was left in the back of a truck. Another pair was put up in a tree. The sheet used to wrap the clothes was buried near a canal. The murder weapon was tossed into the canal.

On the following day, October 11th, there was a gathering at Olson's apartment. Leach again described stabbing Messer and cutting his throat. Leach said he had stabbed Messer about 50 times. He also said that he and Jones had kicked dirt over the body so that it would not be found and that Jones had kicked Messer's teeth out.

The body was found in the early morning of October 11th. A pathologist testified to its condition: The wounds were in six groups—three in the front and three in the back. Those in front were inflicted by one knife (later identified as Leach's hunting knife) and were grouped in the neck, the heart, and the abdomen. Two of the neck wounds had penetrated the jugular vein and, alone, could have caused death. The actual cause of death, however, were the stab wounds to the heart.[7] The autopsy revealed that Messer was alive when he received all 48 stab wounds. The pathologist testified that he thought that there was more than one assailant.

The police arrested Leach on October 12th and Jones, who had fled to Clovis, on October 21st. Linda was with Jones and was arrested as an accessory. She initially refused to make a statement, but later exculpated herself, Jones, and Leach. Still later, on being informed that "anyone caught lying could be prosecuted for perjury," she made statements inculpating Leach and Jones to get her "own ass out of it." The following day, October 22d, Linda led officers to the canal, where the officers recovered the buried sheet as well as the inner sole and upper part of a boot, later identified as Jones's. One Darrow English observed the officers digging near the canal and gave them a knife which his 10-year-old son Richard had discovered near the embankment on October 11th.

Leach testified in his defense. He denied complicity in the attempted robbery at his apartment. He denied that a robbery occurred at the fig orchard, testifying that Messer voluntarily gave Deseguirant the money for the drug purchase and Deseguirant then left on his motorcycle. The three passed the time by throwing knives. To assuage Messer's fears of a "set up," Leach drove off in search of Deseguirant. When he returned, Messer threatened them, and Leach left once again in search of Deseguirant. When he returned the second time, Jones and Messer were fighting. Each had a knife. Messer was killed.

Jones, who was called as a witness by Leach, refused to testify on Fifth Amendment grounds.

---

[7]The wounds inflicted by Messer's own knife—which Jones had used—were grouped in the upper back, the lower back, and the lower right abdomen.

The People proceeded on the theory that Leach was the instigator and planner. The jury was instructed on two theories of first degree murder—deliberate and premeditated murder and felony murder. It was instructed on the lesser included homicide offenses, as well as on conspiracy and on aiding and abetting. As to the felony-murder special circumstance, the jury was also instructed that to find the allegation true, the robbery had to be more than merely incidental to the killing. (*People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468].)

Leach was convicted of robbery with personal use of a deadly weapon—a knife—and of first degree murder with personal use of a deadly weapon—again a knife. The jury also found true the allegations of special circumstances, i.e., (1) that the murder was committed in the commission of a robbery and (2) that it was intentional and involved the infliction of torture.

## II. *Guilt Phase Issues*

### 1. *Representative Jury*

Leach contends that the exclusion of eight prospective jurors because of their opposition to the death penalty denied him a representative jury. A majority of this court rejected the contention in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 (plur. opn.), 374 [197 Cal.Rptr. 803, 673 P.2d 680] (Kaus, J., conc.). (Cf. *Grigsby* v. *Mabry* (8th Cir. 1985) 758 F.2d 226.)

### 2. *Felony Murder and Malice*

Leach urges us to reject the felony-murder rule because it creates an unconstitutional presumption of malice. We settled that issue in *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697].

### 3. *Sequence-of-Trial Motion*

After the trial court granted a motion, made by all parties, to sever the trials of Jones and Leach, each defendant argued that the other should be tried first. Each claimed the other might then give exonerating testimony in the second trial. The prosecutor explained that "the principal in this killing seems to be Leach and most of the facts indicate that Jones, although an active participant at times . . . [was] an aider and abettor [rather] than the actual principal. Therefore, I feel that we should try Mr. Leach first and the possibility of maybe not even having the need for a second—a trial on Jones exist after we conclude with Mr. Leach."

██ The court controls its own calendar; it has discretion to fix the order in which defendants will be tried. Generally, the court will follow the recommendation of the prosecutor. It did so here: "Nobody offers anything other than a bare statement of the possibility that [exonerating testimony will be given by either defendant]. This is insufficient . . . to constitute a showing of any possibility, let alone probability that one or the other of the codefendants would give exonerating testimony as to the other, depending upon who was tried first." At this point, Leach's counsel attempted to interject additional argument. The court responded, "Please don't interrupt me, counsel" and continued, "The Court finds no compelling reason offered by counsel for either of the codefendants as to why one or the other of the codefendants should be tried before the other. That being the case, I believe that the prosecution[] . . . should have the right to try whichever of the codefendants first that they feel they wish to proceed against first." The prosecution chose to try Leach first.

Leach then requested an in camera hearing to determine whether Jones would give exculpatory testimony in Leach's case if Jones were tried first. The court responded: "Isn't it a little late, counsel? You had an opportunity to offer all of your reasons as to why you sought the preference of the trial of one codefendant over another. You argued the matter about four different times. It was submitted and I've ruled on it." ██ We find no abuse of discretion in denying the untimely request.

### 4. *Burden of Proving Voluntariness of Statements*

Before any witnesses were called, the defense moved to suppress Linda's statement to the police after her October 21st arrest and the "fruits" of that statement. The alleged fruits were (1) Linda's expected trial testimony, (2) the items found at the canal, to which she had led the police on October 22d, and (3) the knife which was turned over to the police by Darrow English.

██ It was—and is—defendant's position that the admissibility of these fruits of Linda's statement must be judged by the same standards that would apply if the statement itself were offered against her as a defendant: that the burden of proving the statement voluntary rests on the People and that the appropriate standard is reasonable doubt. The trial court disagreed, as do we.[8]

---

[8]In discussing this issue we assume several doubtful issues of fact or law in defendant's favor. Among these are: (1) The existence of any evidence that would raise a reasonable doubt concerning the voluntariness of Linda's statement. (2) The applicability of the "fruit" argument to the testimony of a witness such as Linda. (Cf. *United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]; *People* v. *Teresinski* (1982) 30 Cal.3d 822, 833-839 [180 Cal.Rptr. 617, 640 P.2d 753].) (3) The question whether the admission in evidence of the buried sheet and Jones's boot was prejudicial error. (4) The People's assertion that the discovery of the knife was "inevitable."

In order to identify the narrow question before us, we state at the outset that we assume it to be immaterial that Linda's statement was not a confession to the crime with which defendant was charged, that—possibly—it was not a full confession to any crime (cf. *People* v. *Atchley* (1959) 53 Cal.2d 160, 169-170 [346 P.2d 764]), and, most vitally, that it is immaterial that the physical evidence uncovered through the statement proved that it was reliable. (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-545 [5 L.Ed.2d 760, 766-769, 81 S.Ct. 735]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 436-439 [20 Cal.Rptr. 165, 369 P.2d 714].) Stated positively, we assume that if, because of coercion, the statement would not have been admissible in a trial in which Linda was the defendant, its fruits were not admissible against defendant. The only question is whether in the trial against defendant, to which Linda was not a party, the prosecution was subject to the same burden and standard of proof which it would have had to shoulder against Linda as a defendant. In other words: in this setting, how should it be determined whether or not the statement was indeed coerced.

*People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672] involved the issue whether the People had to prove the voluntariness of a confession under the reasonable doubt standard or whether a preponderance of the evidence sufficed. We held, of course, that the reasonable doubt standard applied. While for obvious reasons the question whether the burden should be on the defendant never even arose, the reasons that we gave for placing the heavy reasonable doubt burden on the People are instructive.

In *Jimenez* we referred to "[t]he high value that our system of justice places on this right of *the accused* to be free from compulsory self-incrimination." (21 Cal.3d at p. 605, italics added.) We noted that the rule of *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205], was fashioned "to further guarantee that coerced confessions will not be used against *the accused* . . . ." (21 Cal.3d at p. 606, italics added.) We emphasized that a defendant will have a difficult time trying "to convince the jury to disregard this most devastating evidence of his guilt *which emanated from his own mouth* [citation], even when this evidence should, in fact, be viewed with distrust" (21 Cal.3d at pp. 607-608, italics added), and that, therefore, the standard of proof should be one that minimized the risk of a coerced confession being admitted in evidence. Finally, we held that a strict standard of proof might, in some cases, "have a salutary effect on the ultimate fact-finding process by reducing the possibility that coerced confessions *in general* will be admitted and thereby the possibility that coerced *false* confessions will be admitted." (21 Cal.3d at p. 607, italics in original.)

In sum, all the reasons we gave in *Jimenez* for applying a strict standard of proof assumed that the person who had confessed was also the person on trial. Clearly, however, there is no such need for prophylactic rules directed at assuaging our fear of convicting the innocent—or even the guilty—by means of evidence obtained in violation of due process, when the victim of the violation is not the defendant. In such a case, we see no need for departing from the ordinary rule that a party "claiming that a person is guilty of . . . wrongdoing has the burden of proof on that issue." (Evid. Code, § 520.)

### 5. *Instruction on Aiding and Abetting*

The court instructed the jury on aiding and abetting in the language of former CALJIC No. 3.01.[9] In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held that instruction inadequate because it was potentially ambiguous and created the possibility that an aider and abettor could be convicted even though he had not acted with the requisite criminal intent, and in *People* v. *Croy* (1985) *ante,* 1, at p. 12 [221 Cal.Rptr. 592, 710 P.2d 392], we have concluded that *Beeman* applies to cases not yet final at the time of that decision. ▬▬ Leach asserts that, because it is possible that the jury may have found that he was simply an aider and abettor to the robbery and may have based its verdict of guilt on the felony-murder rule, the instructional error with regard to the intent required of an aider and abettor requires a reversal of the judgment of guilt.

Under the prosecution's theory of the case, of course, Leach and Jones were both perpetrators in the stabbing and killing of Messer, with Leach the instigator and leader. If the jury accepted that theory, it would have had no reason to consider the aiding and abetting instructions at all. Nevertheless, because the aiding and abetting instructions were given and the jury theoretically could have reached its verdict on an aiding and abetting theory, we must determine whether the error calls for reversal.

In *People* v. *Croy, supra,* we discuss the proper analysis of the effect of *Beeman* error at some length. As *Croy* explains, although *Beeman* error shares some similarities with the instructional error analyzed in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826]—i.e., "*Carlos* error"—"[t]here is an important difference [between the two instructional errors] . . .: the instruction condemned in *Beeman,* unlike the pre-*Carlos* special circumstance instructions, did not entirely remove the

---

[9]"A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]"

question of the defendant's mental state from the jury's consideration. Former CALJIC No. 3.01, while containing the flaw discussed in *Beeman,* nonetheless informed the jury that the defendant's state of mind was relevant to the aiding and abetting question, explaining that the defendant must have aided the perpetrator *with knowledge of the perpetrator's unlawful purpose* in order to be found guilty as an aider and abettor." (*Croy, supra, ante,* pp. 13-14.) As a consequence, *Croy* concludes that "[t]his difference justifies an adaptation, in the *Beeman* context, of the *Cantrell-Thornton* exception retained in *Garcia*: the parties at least recognized that defendant's state of mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose. Thus, in many cases there may be no unfairness in assuming—for purposes of appeal and subject to the filing of a petition for writ of habeas corpus containing allegations to the contrary—that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given. Since, under former CALJIC No. 3.01, the jury could convict a defendant on an aiding and abetting theory only if it found that he acted with knowledge of the perpetrator's criminal intent, it may be possible in those cases for a court to determine that the *Beeman* error could not possibly have affected the verdict—i.e., that no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime. In those cases, the judgment could be affirmed." (Fn. omitted.) (*Id.,* p. 14.)

The record demonstrates that this is a case in which the *Beeman* error could not possibly have affected the verdict. As already noted, the prosecution's evidence indicated that Leach was the principal perpetrator of the offenses, not simply an aider and abettor, and thus if the jury accepted this evidence the aiding and abetting instructions would not have been applicable at all. On the other hand, in Leach's version of the events, he did not even know of Jones's intent to rob and certainly did not commit nor in any way aid in the commission of either the robbery or the killing. On this state of the record, no reasonable trier of fact, having actually found that defendant acted with the requisite knowledge, "could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime." (*Ibid.*)

Furthermore, because the jury specifically found that Leach personally used a deadly or dangerous weapon in the commission of the robbery, it is clear that it must have rejected Leach's version of the incident. Under the

court's instructions, the use finding meant that the jury found that Leach had "display[ed] such a weapon in an intentionally menacing manner" or that he intentionally struck or hit a human being with it. Although it is perhaps theoretically conceivable that an individual could personally use a deadly weapon and still not intend to facilitate an on-going crime, under no view of the evidence presented in this case could such a "personal use" finding be squared with Leach's testimony. In short, on this record and in view of the use finding there is no possibility that the jury could have found that Leach "aided" the commission of the robbery other than intentionally. We find no reversible error.

### 6. Instruction on Lesser Included Offense

■ Leach contends that the trial court erred in failing to instruct sua sponte on the lesser included offense of grand theft. ■ The trial court must instruct on the general principles of law relevant to the issues raised by the evidence even without a request. We delineated the applicable standard in *People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311]: "The trial court is not obligated to instruct sua sponte on necessarily included offenses unless the evidence would justify a conviction of such offense."

■ Leach denied taking part in the robbery. If his story was believed, he was not guilty of anything. In his version, the theft—if any—was committed by Deseguirant, who took Messer's money for the drug purchase and left. Under no view of the evidence was Leach guilty of mere theft. The court was therefore under no duty to instruct on grand theft.

### 7. Instruction on Testimony of Immunized Witnesses

The trial court properly instructed the jury on witnesses and accomplices. At Leach's request, the court instructed the jury that Deseguirant was an accomplice as a matter of law (CALJIC No. 3.14, 1979 rev.) and that the jury was to determine whether Eric Olson, Kevin Ohnstad, and Michael Western were also accomplices (CALJIC No. 3.19, 1979 rev.).

■ Leach now urges that "this Court should require trial courts to give a cautionary instruction sua sponte [that the testimony of immunized witnesses should be viewed with distrust] in cases, such as this one, where [such testimony] is vital to the jury's consideration of the prosecution's case." He cites no authority, and we find none, to support the position that juries should be given cautionary instructions sua sponte as to the trustworthiness of immunized witness testimony.

### 8. *Juror Misconduct*

After closing arguments, defense counsel brought to the court's attention that Floyd Allen, a friend of Leach's cellmate, had telephoned Juror Debbie Young several times. Young told the court that Allen had attempted to persuade her to hang the jury. She said she had not been influenced by these discussions and had not mentioned the calls to the other jury members. On the People's motion, the court excused Young. Leach did not request Young's discharge and expressly declined an examination of other jurors. He did move for a mistrial on the ground that Young may have discussed the telephone calls with other jurors. The motion was denied. The court explained that it believed Young had been truthful with the court when she said she had not spoken to other jurors and, therefore, found no reason to declare a mistrial.

Leach now insists that the court should have inquired further. The court chose to believe Juror Young and we know of no rule which would have forced it, sua sponte, to confirm its finding by questioning all the other jurors. Such an examination posed great risks: however guarded the court's questions to the other jurors might be, there was an ever-present danger that somehow it would come to light that Young had been improperly approached on behalf of the defense. We see no error.

### 9. *Instruction on Jury Note-Taking*

Leach contends that the court should have instructed the jury sua sponte on the use of notes in deliberations. Since its enactment in 1872, section 1137 has allowed jurors to consult their notes during deliberations. No California case has required specific cautionary instructions be given to jurors before allowing them to take notes. (Cf. *People* v. *DiLuca* (1982) 85 App.Div.2d 439 [448 N.Y.S.2d 730].) In *People* v. *Whitt* (1984) 36 Cal.3d 724, 747 [205 Cal.Rptr. 810, 685 P.2d 1161], we noted that "the better practice is to give such an instruction," but we did not decide whether the instruction was required because the court in *Whitt* had given an instruction which included the cautionary warnings. Whatever the import of *Whitt*, even if retroactively applied—this case was tried before *Whitt*—any error in failing to give the instruction in this case does not compel reversal of the judgment.

### III. *The Findings of Special Circumstances*

Two special circumstance allegations were presented to the jury—(1) felony murder, and (2) torture murder. Leach contends that each must be set aside for failure to instruct that the jury must find that Leach intended to

kill Messer, either as perpetrator or as an aider and abettor. Leach also challenges the torture-murder special circumstance finding on the ground that the jury was not instructed to find an intent to inflict pain.

### 1. *Felony-Murder Special Circumstance*
### *(§ 190.2, subd. (a)(17))*

Leach contends that reversal is required for the court's error, under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in failing to instruct on the necessity for intent to kill in the felony-murder special circumstance. In *People* v. *Garcia, supra,* 36 Cal.3d 539, we concluded that—under federal constitutional principles— *Carlos* error is ordinarily reversible per se because it completely eliminates the issue of intent from the jury's consideration. We recognized, however, that the per se reversal rule was subject to four limited exceptions: (1) where the defendant was acquitted of the relevant charge; (2) where the defendant conceded the issue of intent; (3) where the jury necessarily found the requisite intent to kill as a result of other properly given instructions (the so-called *Sedeno* exception); and (4) where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration (the so-called *Thornton-Cantrell* exception). (*Id.,* at pp. 554-556.)

The present situation falls within the *Sedeno* exception. The jury necessarily found the requisite intent to kill when it found true the other charged special circumstance that "[t]he murder *was intentional* and involved the infliction of torture." (§ 190.2, subd. (a)(18), italics added.) Although we later find, on grounds not relevant to this discussion, that the instruction on torture murder was deficient, that instruction nonetheless correctly posed the intent-to-kill issue for the jury (cf. *People* v. *Ramos* (1984) 37 Cal.3d 136, 147, fn. 2 [207 Cal.Rptr. 800, 689 P.2d 430]), and the jury's finding on that special circumstance necessarily included a determination that Leach intentionally killed the victim. Thus the jury actually found—albeit in a different context—the intent-to-kill element that *Carlos* demands as a necessary prerequisite to felony-murder special circumstance.

Leach contends, however, that the finding of an intentional murder in the second special circumstance does not necessarily resolve the question, for the jury could have found the allegation true on the basis of Jones's intentional killing of Messer. Leach posits that the jury could return a true finding on both special circumstances if it found that Leach aided and abetted Jones in setting up the robbery and further found that Jones intentionally killed Messer: that is, the jury was not required to find that Leach killed Messer

nor even that he intended that Messer be killed in the course of the robbery.[10] Leach's suggestion completely ignores the jury's finding that he personally used a deadly weapon to accomplish the murder. The jury either found that he alone committed the intentional murder or that he aided and abetted Jones in the killing. Again, as with respect to the robbery, the jury must necessarily have found that he committed the "aiding" act and that he did so with knowledge of Jones's criminal purpose. Because of the manner in which Leach defended the case—denial that he in any way aided in the commission of the murder—there was no way for the jury to find that he "aided" the commission of the murder only "accidentally" or "unintentionally." (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)

We conclude, therefore, that on the record in this case the *Sedeno* exception operates to "cure" the *Carlos* error.[11]

## 2. *Torture-Murder Special Circumstance*
### *(§ 190.2, subd. (a)(18))*

Leach challenges the torture-murder special circumstance provision as overbroad and vague, urging that it is constitutionally defective for failure to require proof of an intent to inflict prolonged and extreme pain. Under the 1978 initiative, the torture-murder special circumstance reads: "The murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration." (§ 190.2, subd. (a)(18).) In contrast, the 1977 legislation had provided a special circumstance of torture murder as follows: "The murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain." (§ 190.2, subd. (c)(4).)

The Attorney General concedes that the elimination of the requirement in former section 190.2, subdivision (c)(4) of proof of an intent to inflict extreme and prolonged pain from the present section cannot be construed to mean that the electorate intended that such proof is no longer needed: "The only reasonable interpretation of Penal Code section 190.2, subdivision (a)(18), is that the electorate, in enacting this section, intended to incorporate into it the settled, reasonable, workable, and meaningful definition of

---

[10]As already noted, the instructions on aiding and abetting did not anticipate our holding in *People* v. *Beeman, supra,* 35 Cal.3d 547, 560.

[11]On the state of the record we need not address Leach's contention that the jury may have found, pursuant to instruction on personal "use" of a deadly weapon, that he merely displayed the weapon in a "menacing manner" while aiding in setting up the robbery. (CALJIC No. 17.16.) No view of the evidence supports this characterization of the use finding—neither the prosecution's version that Leach stabbed Messer, or Leach's version that he did nothing to aid the robbery or killing.

the term *torture* contained in *Steger* and *Wiley.*"[12] We agree that the electorate which enacted subdivision (a)(18) intended to incorporate as much of the established judicial meaning of torture as is not inconsistent with the specific language of the initiative. Thus, the torture-murder special circumstance "requires proof of first degree murder, (§ 190.2, subd. (a)), proof the defendant intended to kill and to torture the victim (§ 190.2, subd. (a)(18)), and the infliction of an extremely painful act upon a living victim. (*Ibid.*)" (*People* v. *Davenport* (1985) *post,* 247, at p. 271 [221 Cal.Rptr. 794, 710 P.2d 861].)

 In this case, the jury was instructed as follows: "To find [that] the special circumstance referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved beyond a reasonable doubt: That the murder was intentional, and that the murder involved the infliction of torture. To prove the infliction of torture, the infliction of extreme physical pain must be proved, no matter how long its duration. Awareness of pain by the deceased is not a necessary element of torture." (CALJIC No. 8.81.18.)

Inasmuch as the issue whether Leach intended to inflict pain was not presented to the jury, under the reasoning of *Garcia* the error is reversible per se unless one of exceptions described there applies here. The only exception that might be applicable is the *Cantrell-Thornton* standard that "the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (*Garcia, supra,* at p. 556.) The exception is inapplicable on this record. The record does not establish intent to inflict pain as a matter of law. Indeed, the strong evidence of intent to kill militates to some extent against a finding of intent to inflict pain. Under one view of the evidence, the numerous wounds indicate not so much a wish to inflict pain, as great difficulty in killing Messer. Thus, Leach told his friends after the murder that he had a hard time "getting him down" and described the unsuccessful attempts to slash Messer's throat.

We conclude that the torture-murder special circumstance must be set aside for failure to instruct that defendant must intend to inflict extreme pain.

### IV. *Penalty Trial*

### 1. *No-Sympathy Instruction*

 The jury was instructed at the penalty phase as follows: "As jurors you must not be influenced by pity for the Defendant or by passion, preju-

---

[12]Murder by torture requires the intent to inflict pain. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) Actual awareness of pain by the victim is not a necessary element of first degree murder by torture. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881].)

dice against him. You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. [¶] Both the People and the Defendant have a right to expect that you will conscientiously consider the argument of Counsel, consider and weigh the evidence and apply the law of the case and that you will reach a just verdict regardless of what the consequences of such verdict may be."

The Attorney General concedes that it was error to instruct that the jury was not to consider sympathy in reaching its penalty verdict. (*People* v. *Lanphear* (1984) 36 Cal.3d 163, 165-169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858, 875-880 [196 Cal.Rptr. 309, 671 P.2d 813].) He contends, however, that the error does not require reversal because "unlike the cases of *Lanphear* and *Easley,* the evidence in mitigation put on by the defense was miniscule" in relation to the heinous character of the murder.

The jury should not be foreclosed from considerations of sympathy and compassion when there is any evidence in mitigation. Leach was young, only weeks over 18 when the murder was committed; he had no prior felony convictions and, according to his mother, had had no serious trouble in school; he was one of 5 children of parents who were invalids for much of the time he was at home; his father died when Leach was 15.

The error requires a reversal of the penalty judgment and a remand for a new penalty trial.

### 2. *Other Claims of Error*

We need not reach Leach's other claims of error relating to the penalty phase of the trial in view of our conclusion that the judgment of death must be reversed.

### V. *Conclusion*

The judgment is reversed as to penalty. The special circumstance finding pursuant to section 190.2, subdivision (a)(18), is set aside, and the judgment of guilt is affirmed in all other respects.

Reynoso, J., and Grodin, J., concurred.

MOSK, J.— ██ ██ ██ ██ ██ ██ ██ I concur in affirming the judgment of guilt, but dissent from reversal of the penalty.

Although I agree with the majority that the torture-murder special circumstance cannot be sustained, there remains the felony-murder special circum-

stance which the majority correctly affirm. That leaves only the issue of penalty.

Once again a majority of the court reverse a penalty on the sole ground that the trial judge gave an admonition which they simplistically describe as a "no-sympathy instruction."

As I have consistently pointed out (*People* v. *Bandhauer* (1970) 1 Cal.3d 609, 619 [83 Cal.Rptr. 184, 463 P.2d 408]; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858, 886 [196 Cal.Rptr. 309, 671 P.2d 813]) the instruction in question advises the jurors not to be swayed by passion, prejudice, public opinion, and public feeling, among other emotions, all of which are likely to be antagonistic to a convicted murderer. But the inclusion of the word "sympathy" in that instruction is neutral: it can caution against sympathy for the victim and his family, or it can mean sympathy for the defendant. The former is more likely. In any event, the inclusion of that single equivocal word is not prejudicial; it does not justify a reversal and the requirement of a complete new penalty trial.

I would affirm the judgment in its entirety.

Lucas, J., concurred.

**BIRD, C. J.—** ██ I write separately to convey my concerns about three of the issues presented by this case.

## I.

The plurality uphold the admission of Linda Grant's statements to the police and the evidence that was obtained thereby. (Plur. opn., *ante,* at pp. 102-104.)

It is true, as the plurality indicate, that the holding of *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672] deals only with the voluntariness of an accused's confession and does not by its terms require that the prosecution prove the voluntariness of a statement made by a person other than the accused. Nevertheless, I believe that the necessity of ensuring the sanctity of the truth-seeking process by policing the admissibility of allegedly involuntarily seized evidence requires that when an accused challenges statements by a witness as involuntary the prosecution should prove they were voluntary.

In the search and seizure context, this court has explained that "it is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens obey the law, that government teaches by example, and that if the government becomes a law-breaker, its action breeds contempt for the law. The 'success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such "dirty business." ' . . ." (*People* v. *Blair* (1979) 25 Cal.3d 640, 656 [159 Cal.Rptr. 818, 602 P.2d 738], citing *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].)

Such observations are equally applicable where the admissibility of involuntary statements is concerned. It is incongruous for the state to seize statements involuntarily but require the accused to establish such involuntariness.

Moreover, even though *Jimenez* is based, for the most part, on the premise that an *accused* should not be convicted by his own statements without an affirmative showing by the prosecution as to the voluntariness of those statements, many of the policies that require the prosecution to shoulder that burden are equally applicable where the voluntariness of statements other than by the accused are at issue.[1] For example, coerced statements, even though true, are inadmissible because "the methods used to extract them offend due process . . . ." (*Jimenez, supra,* 21 Cal.3d at p. 606.) Applying *Jimenez*'s principles makes particularly good sense where the witness's statements include alleged admissions by the accused that prove many or all of the elements of the charged offense.

For these reasons, I would apply *Jimenez*'s reasoning to require the prosecution to prove, at least by clear and convincing evidence,[2] the voluntariness of a nonaccused's statements.

---

[1]Indeed, two Court of Appeal opinions apply *Jimenez*—albeit without exhaustive reasoning—to this context, requiring the prosecution to demonstrate voluntariness beyond a reasonable doubt. (*People* v. *Jones* (1980) 105 Cal.App.3d 572, 582 [164 Cal.Rptr. 605] [statements found admissible under this standard]; *People* v. *Gordon* (1978) 84 Cal.App.3d 913, 924 [149 Cal.Rptr. 91] [statements found inadmissible].)

[2]"The standard of proof that is required in a given instance has been said to reflect '. . . the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.' [Citation.] The standard of proof may therefore vary depending upon the gravity of the consequences that would result from an erroneous determination of the issue involved. Where such consequences are serious, the reasonable doubt standard may be required in order to protect against the possibility of an erroneous determination. [Citation.] In order to properly evaluate the consequences that may result from an erroneous determination, it is necessary to consider the nature and purpose

## II.

The plurality uphold the torture special circumstance provision of the 1978 death penalty law (Pen. Code, § 190.2, subd. (a)(18)) by construing it to require proof that the accused intended to kill and to torture the victim, and the infliction of an extremely painful act upon a living victim. (Plur. opn., *ante,* at p. 110.) I would not rewrite the law as explained in my concurring and dissenting opinion in *People* v. *Davenport* (1985) *post,* 247, 290-294 [221 Cal.Rptr. 794, 710 P.2d 861].

## III.

By reversing on only one issue—*Lanphear-Easley* error (*People* v. *Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813])—the plurality fail to discuss the trial court's giving of the "Briggs commutation instruction" that this court held invalid in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. That omission leaves the reader with an erroneous impression.

Even though some justices would not reverse the penalty on *Lanphear-Easley* grounds, in the past they have joined reversals based on *Ramos* error. (See *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248]; *People* v. *Ramos, supra,* 37 Cal.3d at pp. 153-159.) *Ramos* was decided over a year ago and its holding remains intact. Although precedents from this court are often distinguishable on their facts, that is not possible here. The trial judges in *Ramos* and in this case committed identical instructional error. Thus, even without *Lanphear-Easley* error the penalty in this case would have to be reversed.

**BROUSSARD, J.—** ██ ██ ██ ██ ██ ██ I concur in the plurality opinion of Justice Kaus in all but two matters. First, in my opinion the torture-murder special circumstance falls, not because of incorrect jury instructions, but because the underlying statutory provision violates the Eighth Amendment. (See *People* v. *Davenport* (1985) *post,* 247, 290 [221 Cal.Rptr. 794, 710 P.2d. 861] (conc. opn. of Bird, C. J.), *id.* at p. 295 (conc. opn. of Broussard, J.).) Second, I would rest reversal of the penalty judgment not only on the "no sympathy" instruction discussed by

---

of the proceedings involved. [Citation.]" (*Jimenez, supra,* 21 Cal.3d at p. 604.)

I recognize that the "consequences" of an "erroneous determination" as to the voluntariness of a nonaccused's statements may not be as grave for the accused as in the case of an accused's involuntary confession. Unlike a confession, which admits every element of the prosecution's case, the relevance and weight to be accorded a witness's statement varies with the circumstances. For this reason, the clear and convincing standard appears appropriate for this context.

the plurality, but also on the court's erroneous instruction respecting the Governor's power to commute a sentence of life imprisonment without possibility of parole. (See *People* v. *Ramos* (1984) 37 Cal.3d 136, 153-159 [207 Cal.Rptr. 800, 689 P.2d 430].)