[No. F003932. Fifth Dist. June 25, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY A. BARKER, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Christine Zilius, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Joel Carey and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HOOVER, J.*—The defendant appeals from a conviction in the Stanislaus County Superior Court of burglary (Pen. Code, § 459), robbery (Pen. Code, § 211), and mayhem (Pen. Code, § 203). Each count alleged that the defendant inflicted great bodily injury within the meaning of Penal Code section 12022.7 which was found true by the jury. Also, the information alleged two prior serious felony convictions within the meaning of Penal Code section 667, and a prior prison term within the meaning of Penal Code section 667.5, subdivision (b), which the defendant admitted prior to trial.

Appellant was originally sentenced to thirteen years, four months and remanded back to court approximately five weeks later on order of the superior court for resentencing on the ground that appellant had previously been incorrectly sentenced. He was resentenced to the term of twenty years, computed as follows: six years (the upper base term for burglary), three years (enhancement for great bodily injury), five years (prior robbery conviction), one year (prior prison term), and five years (prior burglary conviction), all to run consecutively. The previously imposed sentences with respect to counts II and III, together with their respective enhancements, were confirmed by the court and stayed, such stay to become permanent upon appellant's successful completion of the principal term. The trial court also imposed a restitution order of $6,650 and a "fine" of $1,000 under Government Code section 13967.

Appellant alleges error both during the trial and at sentencing.

### STATEMENT OF THE CASE

On August 10, 1983, appellant, his girlfriend Vicki, Leland Nicholson (Nicholson), and appellant's sister Marilyn Lozano (Lozano) went to Grandma's Bar on Herndon Road in Modesto. There they drank and played pool for approximately 45 minutes. Appellant, Vicki and Lozano left the bar for about five minutes while Lozano was taken to the scene of the crime and dropped off. Appellant and Vicki returned to the bar. Prior to leaving them, Lozano stated she was going to "turn a trick." About 20 to 30 minutes after returning to the bar, appellant received a phone call and after taking

---

*Assigned by the Chairperson of the Judicial Council.

the call stated to Vicki and Nicholson, "Let's go." The three of them departed in Lozano's bluish-gray Isuzu.

Lozano had previously called and asked to spend some time at Ralph Taylor's house. Taylor was an 80-year-old widower and acquaintance of Lozano's. During the six months he had known her she had visited his home on numerous occasions. After being dropped off at Taylor's by appellant and Vicki, Lozano proceeded to engage Taylor in activities calculated to facilitate the crime. Moving to a bedroom to watch a better television set, Lozano raised the volume even over Taylor's protests; the air conditioner was turned on, and the front door opened (although Taylor insisted the night chain be fastened). With the house now less than secure and under cover of the noise level, Lozano left to make sure the front door was opened and returned within 5 to 10 minutes. Lozano then enticed Taylor into some form of sexual activity which resulted in him being tied up, hands and feet together, and lying on the bed.

With the 80-year-old victim helpless, appellant entered the home by climbing through a window over the sink. Taylor testified to being brutally beaten, kicked and struck with a beer bottle.

Shortly after appellant had entered Taylor's home, Lozano came running out the front door screaming for Nicholson. Following Lozano into the house, Nicholson heard an old man screaming and, upon entering the bedroom, observed appellant kicking Taylor as he lay on the floor. The only light on in the bedroom was the television, and appellant was shouting that he wanted Taylor's wallet. Appellant was also holding a gun against Taylor. When Nicholson asked appellant what was going on, appellant stated he wanted the combination to the safe. Lozano showed Nicholson where Taylor's safe was, and Nicholson picked it up and carried it out to the car which Lozano had backed up to the house. While appellant was kicking and striking Taylor, Taylor was lying on the floor moaning and saying, "Give me a minute"; and "Let me think where the wallet is at." Nicholson came back into the bedroom and said to appellant, "Leave him alone"; and "Let's go." After Nicholson told appellant he had the safe and said "Let's get out of here," appellant continued to kick Taylor in the face. Lozano, Nicholson and appellant then left the house and drove off with Vicki in Lozano's car. As they were driving away, appellant swore angrily at Lozano and told her she was stupid and questioned why she had failed to open the front door.

The portable safe taken from Taylor's home contained, in addition to various papers, some $300 to $400 cash. Taylor had kept the safe in the second bedroom of his house. The lock on this bedroom door, which Taylor ordinarily kept locked, had been pried loose.

After the crime Taylor managed to free himself and cross the street, while bleeding heavily, to summon help. Taylor was seriously injured; his nose was severely cut and nearly torn off, one eye was bloodied and swollen shut, and he remained in intensive care for five to seven days.

The crime scene investigation corroborated Taylor's version of the attack and turned up appellant's right index fingerprint on the neck of a broken beer bottle. After being admitted to the hospital and still in pain, Taylor attempted to identify those responsible. He was unable to identify a photograph of Lozano and incorrectly identified Kathy Buchanan, Lozano's sister, as Lozano's mother. Taylor did describe Lozano, who he knew as Marilyn, as a female Caucasian, approximately 30 years, 5 feet 7 inches to 5 feet 9 inches, 125-135 pounds, and with blond hair. Lozano, who is a blond Caucasian, described herself as 5 feet 6 inches tall and weighing 130 pounds. Taylor correctly identified Lozano out of a photographic lineup on August 24, 1983.

Neighbors supplied other details of the crime and clues to the identity of Taylor's attackers.

On September 8, 1983, appellant, in custody in Shasta County for robbery and kidnapping, was interviewed by Detective Mac Reece (Reece), and after a waiver of *Miranda* rights, confessed to his role in the beating and robbery of Taylor.

Appellant's defense essentially claimed he was innocent but had confessed due to threats and pressure made indirectly by Nicholson and out of concern for his sister (Lozano) and Vicki.

The issues raised on appeal are (1) whether the appellant's confession was voluntary; (2) whether the trial court committed reversible error in instructing the jury on aiding and abetting; and (3) whether the appellant was properly sentenced, including the imposition of a restitution order of $6,650 and a "fine" of $1,000.

I.

### THE VOLUNTARINESS OF APPELLANT'S CONFESSION

On September 8, 1983, Stanislaus County Sheriff's Detective Reece and Redding Police Detective Craig Wooden (Wooden) interviewed appellant at the Shasta County Sheriff's Department in Redding, California. Appellant was in custody for a kidnapping and robbery in Shasta County.

After hearing, understanding and waiving his *Miranda* rights, appellant confessed to his part in the robbery and beating of Taylor. During his interview with Reece, appellant asked for and received a promise that Vicki would not be charged for the Taylor robbery if he, appellant, truthfully related the events of that evening. Appellant now contends the trial court erred in finding his confession voluntary and that the prosecution did not satisfy its burden of establishing voluntariness beyond a reasonable doubt as required by *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672].

Appellant argues his confession was elicited by virtue of psychological pressure exerted by Detectives Reece and Wooden through implied threats that Vicki would be prosecuted if appellant did not confess. The trial court received testimony from both appellant and Reece, reviewed a transcript of the confession, and listened to the tape recording of the confession before concluding that appellant's confession was voluntary beyond a reasonable doubt.

Without redigesting every contention presented to the trial court and contained in appellant's briefs on appeal, there appear to be three cognizable points upon which the determination of voluntariness turns.

The first point is the fact that Reece did not inform appellant of his previous decision not to charge Vicki with the Taylor robbery regardless of appellant's statements, but only informed appellant of his agreement to drop charges for a truthful statement.

The second area of interest concerns whether or not appellant's mental condition, with respect to Vicki, affected the voluntariness of the confession.

Lastly, there is a minor issue regarding appellant's physical state (appellant had recently sustained a bullet wound in his arm).

The transcript of appellant's confession reveals that appellant waived his *Miranda* rights and indicated to Reece that he was willing to talk to Reece. Following Reece's inquiry about appellant's bullet wound,[1] appellant said

---

[1]The following conversation was had at the beginning of the interview regarding appellant's bullet wound:

"(REECE) How bad is the wound?

"(BARKER) Its [*sic*], you know what, Mac, its [*sic*], its [*sic*] been (unintelligible) you know, (unintelligible) you know, but its [*sic*] pinching my damn nerve and muscle down

to Reece "You got uh, uh, a warrant, uh, a warrant for my old lady down there for (unintelligible)." Detective Reece told appellant that he "just wanted to talk to Vickie, um, I know she was there. I haven't got an active warrant on Vickie yet." Appellant then responded, "I want to square up everything right now with everybody, you know, I'd deal with everybody right now on conditions that they drop all holds on my old lady, and let us get married in the County Jail . . .", to which Reece responded, "OK, I can, I can deal." Reece told appellant he could deal only with respect to the charges pending in Stanislaus County. Both Reece and Wooden indicated to appellant that they could not make any deals or guarantees regarding any charges proposed or pending against Vicki in Oklahoma or Shasta County. Wooden told appellant, "I can sit here and talk to you, but I'm not going to lie to you, I can't promise you that we can drop charges on her, I'll have to go down and talk to the District Attorney." Appellant repeatedly expressed his love for Vicki and concern that she not be charged, and stated that she had not committed any crimes. Appellant asked for an assurance that Reece would "drop warrants on Vicki" and Reece agreed, explaining "OK. Now, the only thing I have was Vickie outside, I never did have Vickie in the house." Appellant said, "But if you drop that warrant on Vickie I'll cop to my part," and Reece responded, "You got it. You won't, there won't, there won't be any warrant for Vickie." Appellant again stated shortly thereafter, "You know, but all I want is I'll cop out to my part of involvement

---

there, you know, and,

"(REECE) The bullets [sic] still in there then?

"(BARKER) Yeah, its [sic], its [sic] lodged in there, you know, and uh, I tried to have this girl cut it out, you can see its [sic] cut right here, you know, but the damn sylacaine (phoenetic [sic] spelling) you know, wasn't working too hot, you know what I mean, (unintelligible) I aint [sic] no John Wayne you know.

"(REECE) Bite the bullet, huh?

"(BARKER) Yeah, I couldn't handle this shit, man. . . .

"[BARKER] . . . [W]ell what shakes us up is the bullet in my arm is got a pinch in the nerve, man it is causing me to have migraines in my cell, and its [sic] hurting me man, and the only reason I told you before is that I'm trying to get out on parole, you know, so I can beat that parole hold and stuff, you know.

"(WOODEN) Yeah.

"(BARKER) And, and I'm feeling bad, trying to get a doctor signed up for a sick call like everybody does, and I can't get nobody and I need this thing out man, its [sic] still in there.

"(WOODEN) The bullets [sic] still in there?

"(REECE) (unintelligible) would probably like to have the bullet.

"(BARKER) Its [sic] killing me, man. I'm not shitting you one bit, I tried John (unintelligible) broad cutting it out with a scaffold man, but you know (unintelligible) kill the pain so I told her man, I can't bite this son of a bitch. You know.

"(WOODEN) Got any infection? Let me see that thing. What it looks like.

"(REECE) Its [sic] his (unintelligible).

"(BARKER) Its [sic] healed over, you can see where she tried to cut it, it used to pus up, thats [sic] really why I had her lance it took, you know, but (unintelligible) it (unintelligible) in the muscle and it pinches some kind of a nerve inside of there, thats [sic] really, you know, bothering me bad and I think Oklahoma would like to have their old .22 bullet back.

"(WOODEN) I'm sure we can get you an operation and get that sucker out of there."

in this trip, on the conditions on Vickie there is no warrant." After repeatedly asking for assurances from Reece that Vicki would not be charged nor a warrant issued for her arrest, appellant said, "But, you know, I asked you, Mac, you know, I copped to my part, you know what I'm saying? I aint [*sic*] got nothing to lose . . . they're going to get me for the (unintelligible) anyway right now. I'm a four time loser, man." Appellant then proceeded to detail his involvement in the crimes committed against Taylor.

■ Appellant contends it is the function of this court to "determine independently whether the confession was voluntary, recognizing that the burden is on the state to prove, beyond a reasonable doubt, that the confession was given freely without any previous inducement, intimidation or threat." (Citing *People* v. *Jimenez, supra,* 21 Cal.3d at pp. 600, 609.) In fact, the duty of the reviewing court, as explained by the Supreme Court in *Jimenez,* is: "'". . . to examine the *uncontradicted* facts to determine independently whether the trial court's conclusion of voluntariness was properly found. . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat . . . . [Citations.]" . . .' With respect to conflicting testimony, of course, '. . . we accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citations.]" (*Id.* at p. 609.)

■ Whether a confession is voluntary and therefore admissible into evidence is a matter to be determined by the trial court outside the presence of the jury, as provided in Evidence Code section 405. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 604.)

■ The trial court below, after listening to the conflicting testimony of appellant and Detective Reece, and after reading the transcript of appellant's confession and listening to the tape recording, decided to accept the testimony of Detective Reece that there were no promises or discussions had with appellant prior to the tape recorded statement and confession. Furthermore, the trial court determined that the evidence established that appellant initiated the proposed agreement to confess to the charges in the instant case if no charges would be filed against his girlfriend. The court expressly stated that the prosecution had established the voluntariness of the statement "beyond a reasonable doubt."

■ We have previously stated that "[i]n determining the question of the voluntariness of appellant's statements, this court must consider the *entire* record below." (*People* v. *Adams* (1983) 143 Cal.App.3d 970, 984

[192 Cal.Rptr. 290]; *Davis v. North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898, 86 S.Ct. 1761].) "We must examine 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citations.]" (*People v. Adams, supra,* 143 Cal.App.3d at p. 984.) The foregoing is, of course, subject to the rule that where evidence is in conflict, "this court must accept the trial court's resolution 'unless the evidence relied on by the trial court is so improbable as to be entirely unworthy of belief.'" (*People v. Adams, supra,* 143 Cal.App.3d at p. 984, citing *People v. Jimenez, supra,* 21 Cal.3d at p. 607 and *People v. Davis* (1981) 29 Cal.3d 814, 826 [176 Cal.Rptr. 521, 633 P.2d 186].)

In the case in bar, the testimony of Detective Reece was contradicted by the testimony of appellant during the Evidence Code section 402 hearing. We must accept the trial court's determination to believe the testimony of Detective Reece that no promises were made or deals offered to appellant prior to his tape recorded statement. The record does not contain evidence "so improbable as to be entirely unworthy of belief." (*People v. Jimenez, supra,* 21 Cal.3d at p. 607.)

With respect to the evidence of appellant's tape-recorded statement of confession to Detectives Reece and Wooden, appellant suggests that promises or agreements made with respect to whether charges would be filed against appellant's girlfriend render appellant's confession invalid. "A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid." (*People v. Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People v. Trout* (1960) 54 Cal.2d 576, 584-585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) In the instant case, Detective Reece informed appellant that he did not yet have a warrant on appellant's girlfriend and did not have sufficient evidence to place her at the scene of the crime and thereby implicate her. Although appellant suggests the failure of Detective Reece to expressly tell appellant that he did not intend to charge appellant's girlfriend constitutes an implied threat to so charge her, a review of the record indicates that such a construction in this context is improbable. Detective Reece testified he did not tell appellant he would arrest appellant's girlfriend if appellant did not cooperate.

Appellant also relies on *United States v. McShane* (9th Cir. 1972) 462 F.2d 5 in which the defendant was convicted of various firearms possession charges. The defendant contended the authorities coerced his confession by playing upon defendant's emotional attachment to his girlfriend. Defendant was arrested at his girlfriend's apartment and the authorities took defendant's girlfriend to the police station for questioning. The authorities questioned

the defendant's girlfriend regarding the weapons and allowed defendant and his girlfriend to meet out of the presence of the authorities. Defendant then indicated to one of the officers that he would confess if they would let his girlfriend go, and the officer responded that the girlfriend could leave at any time. Defendant thereafter confessed. Noting that the trial judge found that the officers had never threatened to arrest defendant's girlfriend or hinted at any deals with respect to her, the court concluded the issue before it was whether "impermissible coercion should be implied from the police action in taking [defendant's girlfriend] to the station and allowing [her] and [defendant] to talk together in the station house." (462 F.2d at p. 6.) The court concluded the confession was not coerced, noting that many cases have "rejected the contention that a confession is involuntary if it is motivated by a desire to shield a loved one or spare her the ordeal of questioning and confinement." (462 F.2d at p. 7.) Appellant relies on the following dicta in *United States* v. *McShane*: "If the officers in the case before us had expressly threatened [defendant's girlfriend] with arrest and prosecution, or had bargained with [defendant] to get his confession in exchange for her release, we would have serious doubts about the admissibility of the confession." (462 F.2d at p. 7.)

The instant case simply does not rise to the level of the hypothetical facts contained in the *McShane* dicta. Nor is it susceptible to the interpretation that Detectives Reece and Wooden bargained with appellant to obtain his confession in exchange for appellant's girlfriend's release. Detective Reece made clear the fact that he had no warrant for Vicki's arrest and did not even have sufficient evidence to implicate her in the crime.

It is true that Detective Reece did agree to avoid charging appellant's girlfriend in exchange for appellant's truthful testimony, after appellant had initiated the subject of leniency. However, such an agreement does not necessarily render a subsequent confession inadmissible where the subject of leniency for friends or relatives was initiated by the suspect rather than the authorities. (See *People* v. *Kendrick* (1961) 56 Cal.2d 71, 84-85 [14 Cal.Rptr. 13, 363 P.2d 13] [court determined no previous inducement by detectives and no promises "other than to carry the matter of possible release of defendant's friends to higher authorities"].) "The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary." (*People* v. *Abbott* (1958) 156 Cal.App.2d 601, 605 [319 P.2d 664].)

Appellant also relies on appellant's mental condition at the time of the interrogation. Among the circumstances to be considered as part of the "totality of the circumstances" are the mental capacity and intelligence

of the accused. (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74].) In the instant case, the only evidence of appellant's mental condition was appellant's statements to Detectives Reece and Wooden expressing his great love for his girlfriend and concern that she not be charged because she was not involved and was young and had a child to tend to. An independent examination of this uncontradicted evidence does not lead to the conclusion that appellant was "obviously distraught" or otherwise in a highly emotional state.

With respect to the contention that appellant was in "severe pain" from his bullet wound, assuming that the statements by appellant to Detectives Reece and Wooden are uncontradicted, an independent examination simply does not lead to the conclusion that appellant was suffering from pain severe enough to impair appellant's ability to make a voluntary confession. Furthermore, the record contains arguably contradictory evidence in the testimony of Detective Reece that the wound appeared "healed over."

It is altogether clear that the trial court applied the proper standard to the facts and correctly found the confession voluntary.

II.

BEEMAN ERROR AND THE STANDARD OF PREJUDICE

Since the evidence suggested that Lozano bound Taylor before appellant entered the house and either personally or in concert with Nicholson committed the robbery and mayhem, the prosecution asked that the jury be instructed concerning appellant's liability as an aider and abettor. To this end, the trial court instructed the jury pursuant to CALJIC Nos. 3.00, 3.01 and 3.02. These instructions have been held to inadequately inform the jury of the need to establish the aider/abettor's *intent* in addition to knowledge and aid. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].)

In *People* v. *Beeman, supra,* the Supreme Court was faced with the issue of whether the standard California Jury Instructions, CALJIC Nos. 3.00 and 3.01, adequately informed the jury in that case of the criminal intent required to convict a defendant as an aider and abettor of the crimes of, inter alia, robbery, burglary and assault with intent to commit a felony. (35 Cal.3d at pp. 550-551.) On the issue of intent, the Supreme Court concluded: ". . . the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose of either committing, or of encouraging or facilitating commission of, the offense. [Citations omitted.]

"When the definition of the offense includes the intent to do some act or achieve some consequence beyond the actus reus of the crime [citation omitted], the aider and abettor must share the specific intent of the perpetrator. . . . [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (35 Cal.3d at p. 560.) Respondent appears to impliedly concede that the version of CALJIC No. 3.01 given in the instant case, together with the related instructions, CALJIC Nos. 3.00 and 3.02, suffer from the *Beeman* infirmity.

In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], the Supreme Court established a test of prejudicial error for failure to instruct on intent as an element of an offense. In *Garcia*, the trial court had committed *Carlos*[2] error by failing to instruct that proof of intent to kill was requisite to finding a felony murder special circumstance under Penal Code section 190.2, subdivision (a)(17). Concluding such error was reversible per se in the absence of any basis for concluding the error had not affected the verdict, the Supreme Court then set forth four exceptions to the rule of reversal per se. The first two exceptions were derived from *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969]: "[1] 'if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted,' and [2] 'if the defendant conceded the issue of intent.'" (36 Cal.3d at pp. 554-555.) The remaining two exceptions were derived from prior California Supreme Court decisions: "[3] if '"the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions"' [citations omitted], or [4] under limited circumstances, if 'the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration.'" (*People* v. *Ramos* (1984) 37 Cal.3d 136, 146-147 [207 Cal.Rptr. 800, 689 P.2d 430].)

In *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392] and *People* v. *Leach* (1985) 41 Cal.3d 92 [221 Cal.Rptr. 826, 710 P.2d 893], the Supreme Court concluded *Beeman* error, similar to the *Carlos* error condemned in *Garcia,* was reversible per se subject to *Garcia*'s four exceptions. (*People* v. *Leach, supra,* 41 Cal.3d at pp. 104-106; *People* v. *Croy, supra,* 41 Cal.3d at pp. 12-14.)

Respondent first invokes the third *Garcia* exception, recognized as applicable to *Beeman* error by *Croy* and *Leach,* and contends the "question

---

[2]*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

of intent posed by the omission of intent from the standard aiding and abetting instructions was necessarily resolved adversely to appellant under other properly given instructions." The jury was instructed that appellant was accused of "personally and intentionally" inflicting great bodily injury upon Taylor during the commission of each count of the information. The court also instructed the jury pursuant to CALJIC No. 17.20, that the jury, should it find defendant guilty of any or all counts, must "determine whether or not the defendant, with the specific intent to inflict such injury, did personally inflict great bodily injury . . . ."

Assuming that the jury understood and followed the aforementioned instructions, it is clear that the jury specifically found that appellant *personally and intentionally* inflicted great bodily injury upon victim Taylor *during* the commission of the burglary, robbery and mayhem charged. We find that no juror could reasonably have concluded appellant personally and intentionally inflicted great bodily injury upon Taylor without also concluding that appellant personally intended to facilitate the burglary, robbery and mayhem.

In *People* v. *Sedeno* (1974) 10 Cal.3d 703, at page 721 [112 Cal.Rptr. 1, 518 P.2d 913], the case from which *Garcia* derived its third exception, the Supreme Court stated: "Thus, in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions."

In the instant case, the defendant was convicted of burglary, robbery and mayhem. To find him guilty, even given the improper instruction on intent, the jury must necessarily have concluded that the defendant *knew* of these crimes in advance or at least while he assisted in their commission. It is nearly impossible that the jury could have determined that appellant had knowledge of the criminal purpose of Lozano and/or Nicholson, as well as the specific intent to personally inflict great bodily injury on Taylor, but also lacked the intent to further their criminal purpose.

The *Beeman* error in this case may also be deemed harmless by applying the fourth *Garcia* exception. The trial court in *Leach* committed *Beeman* error by instructing the jury on aiding and abetting in the language of former CALJIC No. 3.01. The Supreme Court adopted, as the standard of prejudice, the *Garcia* reversal per se standard, subject to the four *Garcia* exceptions. However, the Supreme Court modified the fourth exception, stating: "'[t]his difference [between *Carlos* error and *Beeman* error] justifies an adaptation, in the *Beeman* context, of the *Cantrell-Thornton* exception retained in *Garcia*: the parties at least recognize that defendant's state of

mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose. Thus, in many cases there may be no unfairness in assuming—for purposes of appeal and subject to the filing of a petition for writ of habeas corpus containing allegations to the contrary—that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given.'" (41 Cal.3d at p. 105.)

The court in *Leach* relied specifically on the fact the jury made a special finding that the defendant had personally used a deadly or dangerous weapon in the commission of the robbery. In the view of the Supreme Court, this fact made it clear that the jury must have rejected the defendant's version of the incident. (41 Cal.3d at p. 105.)

The modified *Cantrell-Thornton* exception applied by *Leach* to *Beeman* error is no more than the application of a two-part test, requiring that the requisite intent be established as a matter of law and that there be no evidence worthy of consideration to the contrary, together with an assumption that the defendant has presented evidence and made a record equal to that which he would have made had he known the more precise *Beeman* instruction should be given. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 768-769 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Leach, supra,* 41 Cal.3d at p. 105.)

The evidence presented by the prosecution in the instant case pointed strongly to appellant's role as the principal perpetrator of the robbery and violent attack on Taylor. Appellant's fingerprint was found on the broken neck of a beer bottle which was likely the instrument used to attack Taylor. Nicholson testified of the fact that appellant savagely beat Taylor. Appellant gave a statement to the authorities confessing his responsibility in the crimes. Appellant's defense consisted primarily of attempts to impeach Nicholson and to establish the involuntary character of appellant's confession. Appellant also alibied that he had spent the evening of August 10, 1983, with his wife at another location in Merced, and denied any responsibility for the crimes committed against Taylor. The fact that the jury made the specific finding that appellant had personally inflicted great bodily injury on Taylor during the events in question, together with the fact that the jury necessarily resolved adversely to appellant the issue of appellant's knowledge of the criminal purpose of his cohorts by finding him guilty of burglary and robbery, amply supports the conclusion that "this is a case in which the *Beeman*

error could not possibly have affected the verdict." (*People* v. *Leach, supra,* 41 Cal.3d at p. 105.) It stretches the bounds of reason to think that the jury could have concluded appellant had knowledge of the criminal purpose of Nicholson and Lozano and himself personally inflicted great bodily injury, while also concluding appellant did not "intend to facilitate an on-going crime . . . ." (41 Cal.3d at p. 106.)

Therefore, by sound application of either the third or fourth *Garcia* exceptions to *Beeman* error in this case, our conclusion is that such error is harmless and does not require reversal.

## III.

### SENTENCING ERRORS

Appellant's final contention concerns allegations of various sentencing errors. As previously stated, the court sentenced appellant to prison for twenty years by adding to the aggravated upper base term of six years for burglary, three years for the great bodily injury enhancement, five years each for separate prior burglary and robbery felony convictions, and one year for a prior forgery (Pen. Code, § 475) felony conviction, all added consecutively.

In imposing its original sentence the court set forth the following reasons:

"[The Court]: All right. The Court finds that the base term on Count I, a violation of Section 459 of the Penal Code, burglary of the first degree, shall be the upper term of six years because of the fact, as stated under Rule 421(a)(3), Mr. Taylor was a particularly vulnerable victim. Under 421(a)(5), Mr. Barker occupied a position of leadership in the offense. Under 421(a)(8), the evidence indicated that the offenses were committed with planning and premeditation. Under 421(a)(12), Mr. Barker took advantage of a position of trust, that being Mr. Taylor's trust in the co-Defendant Marilyn Lozano. Under 421(b)(1), Mr. Barker's pattern of violent conduct indicates that he's a danger to society, and in that the Court relates— refers to the prior robbery conviction suffered by Mr. Barker, also a prior what the Court believes is a kidnapping and robbery conviction within the last year in Shasta County, and also because under 421(b)(3)—strike that. The Court finds that under Rule 423 there are no mitigating factors in this matter.

"The Court finds that under 12022.7 of the California Penal Code, an enhancement of three years shall be added because of the fact that Mr.

Barker personally inflicted great bodily injury on Mr. Taylor during the commission of the burglary.

"Because of the fact that Mr. Barker is presently serving a life term in— arising out of Shasta County, the Court is compelled under Section 654 of the Penal Code to stay all but one-third of the midterm and all but one-third of the great bodily injury enhancement, which means that the actual time Mr. Barker will be doing, exclusive of the 667 enhancements, will be 16 months, which is one-third of the middle term, and one year, which is one-third of the enhancement.

"In addition to that amount of time, the Court will impose an additional five years under Section 667 of the Penal Code because of Mr. Barker's prior robbery conviction. It will impose another and consecutive—and by the way, that first five years is intended to be consecutive to the base term— the Court will impose a second consecutive five-year sentence under 667 of the Penal Code because of the prior separate burglary of the first degree conviction, and will impose an additional and consecutive one-year sentence under Section 667.5(b) of the Penal Code because of the prior conviction under Section 475 of the Penal Code, a forgery type offense for which Mr. Barker served a prior and separate state prison term." The court imposed the same sentence for counts II and III as it did for count I, but stayed those sentences pursuant to Penal Code section 654.

At a resentencing hearing on May 18, 1984, appellant was resentenced to the term of 20 years, with the aggravated term reimposed for the same reasons set forth during the original sentencing hearing. The essence of appellant's objection is that the trial court erred in relying on appellant's prior robbery conviction as an aggravating factor under California Rules of Court, rule 421(b)(1),[3] which also served as the basis for the imposition of a five-year enhancement pursuant to Penal Code section 667.[4]

Penal Code section 1170, subdivision (b) indicates the sentencing court "may not impose an upper term by using the fact of any enhancement upon

---

[3]California Rules of Court, rule 421(b)(1) includes as a circumstance in aggravation the fact that the defendant "has engaged in a pattern of violent conduct which indicates a serious danger to society."

[4]Penal Code section 667, subdivision (a) states: "Any person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively." Appellant's prior conviction of robbery is a "serious felony" within the meaning of Penal Code section 667 and section 1192.7.

which sentence is imposed under Section 667.5, 1170.1, 12022, 12022.4, 12022.5, 12022.6, or 12022.7." California Rules of Court, rule 441(c) states that a "fact used to enhance the defendant's prison sentence may not be used to impose the upper term." Although Penal Code section 1170, subdivision (b) by its terms does not apply to sentences imposed under Penal Code section 667, nevertheless the proscription against dual use of facts contained in rule 441(c) "applies to all enhancements, and hence to all consecutive sentences, without regard to the statutory source of those enhancements." (*People* v. *Reeder* (1984) 152 Cal.App.3d 900, 919 [200 Cal.Rptr. 479].) Respondent contends, citing *People* v. *Hurley* (1983) 144 Cal.App.3d 706 [192 Cal.Rptr. 805], that "the reference to the prior conviction as part of a defendant's overall pattern of criminality [rule 421(b)(1)] did not constitute an improper dual use of facts merely because the prior conviction also led to the prior prison term which was the basis of one of appellant's defendant's [*sic*] prior prison term enhancements." In *People* v. *Hurley, supra,* this court stated a "trial court may use the fact of prior *conviction,* even where it underlies a prior prison term enhancement, to help show numerous convictions under rule 421(b)(2) because this is not the fact on which enhancement is based." (144 Cal.App.3d at p. 709.) In the instant case, the trial court enhanced appellant's sentence under Penal Code section 667, relying on the fact of the prior robbery conviction rather than the fact of the prison term for that conviction. Respondent's reliance on *People* v. *Hurley* is misplaced.

Unlike the situation in *Hurley,* the trial court in the instant case relied upon the fact of appellant's prior robbery conviction both to justify application of the aggravating circumstance of appellant's pattern of violent conduct and to enhance for a prior felony conviction under Penal Code section 667. In *People* v. *Roberson* (1978) 81 Cal.App.3d 890 [146 Cal.Rptr. 777], the defendant was sentenced to the upper base term in part because of defendant's prior convictions indicating excessive criminality and a pattern of violent conduct. Two of the prior convictions were used as sentence enhancements. The court concluded, however, that the "remaining three [prior convictions] were sufficient to show a pattern of violent conduct and excessive criminality in support of an aggravated sentence" and therefore the sentencing court did not impermissibly make dual use of facts. (81 Cal.App.3d at p. 894.) Unlike the instant case, the sentencing court in *Roberson* did not specify which prior conviction it was relying upon to find excessive criminality and a pattern of violent conduct. By inference, the opinion in *Roberson* supports the view that reliance by a sentencing court on a specific prior conviction to find a circumstance in aggravation, while also relying on the same prior conviction to impose a sentence enhancement, is improper dual use of facts.

 Despite the trial court's error in relying upon appellant's prior conviction as a circumstance in aggravation as well as to support a sentence enhancement, appellant's contention that the case must be remanded for resentencing is without merit. This is not a case in which the upper term was imposed on the basis of one or two aggravating factors only. Rather, the trial court relied on four other circumstances in aggravation under rule 421—circumstances which are not contested herein. Furthermore, the court noted that there were no circumstances in mitigation pursuant to rule 423. The upper term was justified if the circumstances in aggravation outweighed the circumstances in mitigation. (Cal. Rules of Court, rule 439.) Assuming that the aggravating circumstance of appellant's prior conviction is unavailable, the remaining circumstances in aggravation amply support imposition of the upper term. On the record before us it cannot be said that a result more favorable to appellant is reasonably probable on remand. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Martinez* (1980) 106 Cal.App.3d 524, 537 [165 Cal.Rptr. 160].)

 Appellant's next contention is that the trial court erred in failing to strike the separate enhancements for personal infliction of great bodily injury with respect to counts II and III, pursuant to Penal Code section 654. Because the enhancements resulted from the infliction of injury to one victim during a single course of conduct, appellant contends the court should have stricken rather than merely stayed the enhancements.

Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

Unless the act constituted a crime against more than one person, Penal Code section 654 prohibits multiple punishment for the same act. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885, 887 [135 Cal.Rptr. 654, 558 P.2d 552].) This principle has been applied to prohibit the imposition of multiple enhancements for a single act of infliction of great bodily injury upon one victim. (*People* v. *Moringlane* (1982) 127 Cal.App.3d 811, 817 [179 Cal.Rptr. 726].)

In each of the cases cited by appellant in support of the view that the enhancements in violation of Penal Code section 654 must be stricken, the trial court had not stayed any of the improper additional enhancements. (See *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23]; *People* v. *Moringlane, supra,* 127 Cal.App.3d 811; see also *People* v. *Hopkins* (1985) 167 Cal.App.3d 110 [212 Cal.Rptr. 888].) It must be remembered that the purpose of Penal Code section 654 is to prohibit *double*

*punishment,* rather than *double conviction.* (*People* v. *McFarland* (1962) 58 Cal.2d 748, 762-763 [26 Cal.Rptr. 473, 376 P.2d 449].) "The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned." (*Ibid.*) Post-*McFarland* cases have plainly established the procedure that the trial court may stay sentence on the offense to which Penal Code section 654 is applicable pending successful completion of sentence for the principal offense, at which time the stay is to become permanent, or, on appeal, the reviewing court may reverse the judgment to the extent the lesser sentence is concerned. (*People* v. *Miller, supra,* 18 Cal.3d 873, 886; *People* v. *Beamon* (1973) 8 Cal.3d 625, 640 [105 Cal.Rptr. 681, 504 P.2d 905].) The trial court below complied with the foregoing procedure. Because appellant does not bear the risk of multiple punishment, no error occurred.

■■■ Appellant's final contention is that the trial court imposed a restitution fine of $6,650 pursuant to Penal Code section 1202.4. The offenses in the instant case were committed on August 10, 1983, and appellant argues that section 1202.4 did not become effective until September 27, 1983. In fact this court has ruled in *People* v. *McCaskey* (1985) 170 Cal.App.3d 411 [216 Cal.Rptr. 54] that the Crime Victim Restitution Program of 1983, in which section 1202.4 and Government Code section 13967 appear in their present form,[5] is not applicable to persons committing offenses prior to its operative date of January 1, 1984. (170 Cal.App.3d at p. 418.) It therefore seems clear that the restitution fine order is improper unless the same result could have occurred under existing statutes.

---

[5] Penal Code section 1202.4, added by Statutes 1983, chapter 1092, section 320.1, at the time of sentencing of appellant provided in part: "(a) In any case in which a defendant is convicted of a felony, the court shall order the defendant to pay a restitution fine as provided in subdivision (a) of Section 13967 of the Government Code. Such restitution fine shall be in addition to any other penalty or fine imposed and shall be ordered regardless of the defendant's present ability to pay. However, if the court finds that there are compelling and extraordinary reasons, the court may waive imposition of that portion of the restitution fine which exceeds the prescribed minimum amount. When such a waiver is granted, the court shall state on the record all reasons supporting the waiver."

Government Code section 13967, as amended by Statutes 1983, chapter 1092, section 135.2, provided in part: "Upon a person being convicted of any crime in the State of California, the court shall, in addition to any other penalty provided or imposed under the law, order the defendant to pay a restitution fine in the form of a penalty assessment in accordance with Section 1464 of the Penal Code. If the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000). In setting the amount of the fine for felony convictions, the court shall consider any relevant factors including, but not limited to, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, and the extent to which others suffered losses as a result of the crime. Such losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Except as provided in Section 1202.4 of the Penal Code, under no circumstances shall the court fail to impose the separate and additional restitution fine required by this section."

Respondent contends that the restitution order was properly authorized under the version of Government Code section 13967 operative on August 10, 1983.[6] In fact, during appellant's original sentencing hearing, the only context in which a fine was discussed was as a mandate of Government Code section 13967. Penal Code section 1202.4, which was in existence in March 1984 during appellant's sentencing but was not applicable, was never mentioned. This omission might suggest that the court correctly employed its powers under the 1983 version of Government Code section 13967. That section required the court to impose a "fine," yet the current version of section 13967 which existed when appellant was sentenced called for a "restitution fine in the form of a penalty" as well as a "separate and additional restitution fine." The clerk's transcript shows clearly that the court ordered appellant to pay "restitution" in the amount of $6,650 and a "fine under Section 13967" in the amount of $1,000. An analysis of the record therefore would more logically lead to the conclusion that the trial court was relying, improperly, on the current version of Government Code section 13967. The essence of respondent's argument is that the "trial court's restitution order in the case at hand adequately met the spirit of the provisions of former section 13967 since it was made clear when the order was imposed that it would not be enforceable until appellant acquired the funds to make payments under the order." In fact, the record reveals some discussion between the court and counsel indicating assumptions that appellant would be earning money in state prison and might even some day manage to obtain other money through a judgment or award. The prosecutor suggested that appellant might pay a portion of the restitution with the money appellant earned in state prison and pay the rest following appellant's release from prison. Obviously, these comments by the prosecutor were highly speculative. The court then concluded that it would "simply make the order then that that amount of restitution be paid" without indicating the terms and conditions of repayment. It is questionable whether the foregoing satisfies the requirement under former Government Code section 13967 that the court determine appellant's "present ability to pay a fine" and that the "economic impact of the fine upon the defendant's dependents will not cause such dependents to be dependent on public welfare . . . ." Although it is arguable that the trial court in the instant case at least impliedly considered appellant's ability to pay and the potential economic hardship to his dependents, the

---

[6]The version of Government Code section 13967 operative on August 10, 1983, provided in relevant part: "(a) Upon a person being convicted of a crime of violence committed in the State of California resulting in the injury or death of another person, if the court finds that the defendant has the present ability to pay a fine and finds that the economic impact of the fine upon the defendant's dependents will not cause such dependents to be dependent on public welfare the court shall, in addition to any other penalty, order the defendant to pay a fine commensurate with the offense committed, and with the probable economic impact upon the victim, of at least ten dollars ($10), but not to exceed ten thousand dollars ($10,000)."

more appropriate interpretation is that the trial court failed to do so and remand is therefore necessary to permit the trial court to make this determination.

The judgment and prison sentence are affirmed, and the restitution fine order is vacated and remanded to the trial court for an appropriate determination, consistent with the views expressed herein, under the former version of section 13967 of the Government Code.

Franson, Acting P. J., and Martin, J., concurred.