See Dissenting Opinion

Filed 2/1/23

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Petitioner, | E078405 |
| v. | (Super.Ct.No. INF2000098) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| LEONARDO DANIEL ALVARADO FERNANDEZ, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Dale R. Wells, petition granted.

Michael A. Hestrin. District Attorney, and John F. Pomeroy, Deputy District Attorney for Petitioner.

No appearance by Respondent.

Dolan Law Offices and John Patrick Dolan for Real Party in Interest.

When Leonardo Fernandez arrived at the hospital with his son Marco, the child was 13 weeks old and already dead. During Marco's brief life, he had sustained 18 separate rib fractures and bruises spattered his body. Blunt forces had caused several skull fractures and contusions on his brain. An expert later testified that Marco died from a blow to the left side of his skull.

The issue before us is whether at the preliminary hearing the People demonstrated a rational ground for concluding that Fernandez intended to kill Marco, an element necessary to charge the torture-murder special circumstance. We conclude that showing was made and grant a writ of mandate to order the charge reinstated.

## I. BACKGROUND

Marco was born on October 16, 2019, and died just 13 weeks later, on January 16, 2020. At 4:08 a.m. that day, Marco's parents, Leonardo Fernandez (the Real Party in Interest on this petition) and Zue Flores, arrived with him at a hospital where staff found him cold to the touch, displaying no pulse and dilated eyes. He did not revive with CPR, a breathing bag, or intravenous medications meant to stimulate his heart. He was declared dead on arrival, and by 5:00 a.m. a deputy coroner was examining him.

In the immediate police investigation, the parents offered a story about Fernandez falling with Marco while hiking, which they said was either the previous day or two days earlier. But in later police interviews, both parents admitted they were lying about the hiking fall. They instead asserted that Marco's hospital trip resulted from Fernandez's shaking the baby to stop his crying in a car seat the previous night. Upon the shaking,

Marco's body purportedly "went limp," he began breathing shallowly, and his "trouble breathing" caused them to take him to the hospital.

When asked why Marco's body showed injuries, Fernandez admitted to police officers that he had struck Marco. He admitted punching Marco on the ribcage, whipping him with a towel in the eye, and slapping and squeezing his leg. He stated that the baby had once fallen off a bed onto a tile floor on his back. Flores acknowledged seeing Fernandez use a pole to bruise the bottom of the baby's feet. Flores explained that because Marco was born paler than their other children, Fernandez accused her of infidelity. She said that Fernandez called the baby by a nickname, the Spanish word for gopher.

Five days after Marco's death, the People filed a felony complaint charging Fernandez with the premeditated murder of Marco (Pen. Code, § 187, subd. (a)) and the special circumstance of a murder that was intentional and involved the infliction of torture (*id.*, § 190.2, subd. (a)(18)).[1] A magistrate judge held a preliminary hearing that included four days of testimony from law enforcement officers and medical personnel; this hearing provided the facts that are before us. At the hearing's end, the magistrate found sufficient evidence to hold Fernandez as to the murder charge, but not as to the special circumstance. In particular, the magistrate focused on the lack of evidence of

---

[1] Further statutory citations are to the Penal Code. The complaint and the later-filed information contained other charges against Fernandez and charges against Flores that are not relevant here.

precisely how Marco died, concluding that he did not "have enough information before me to say at that point [Fernandez] had an intent to kill."

The People later filed an information charging Fernandez with Marco's murder, as well as with the torture-murder special circumstance. Fernandez moved to set aside the special circumstance charge pursuant to section 995. At a hearing on that motion, the trial court said it believed that "the evidence does show that Mr. Fernandez had a specific intent to kill Marco and that he had a specific intent to torture Marco to that end." But the trial court stated that it was not allowed to "substitute my judgment as to the weight of the evidence" for the magistrate's judgment, so it granted Fernandez's motion and struck the special circumstance from the information. The People filed the instant petition for a writ of prohibition or mandate and requested that we order the special circumstance reinstated.

## II. STANDARD OF REVIEW

After a criminal complaint has been filed, a magistrate must determine pursuant to section 872 whether "sufficient cause" justifies holding the defendant to answer for the offense. (*People v. Slaughter* (1984) 35 Cal.3d 629, 636 (*Slaughter*).) The standard, equated with probable cause, is "quite distinct" from the burden needed to convict the defendant. (*Id.* at p. 637.) The magistrate is to decide if there is "'"'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.'"'" (*Ibid.* [quoting *People v. Orin* (1975) 13 Cal.3d 937, 947].)

4

In making a probable cause determination "magistrates do not themselves decide whether the defendant is guilty," so a magistrate's personal opinion about a defendant's guilt "is of no legal significance" as the case proceeds. (*Cooley v. Superior Court of Alameda County* (2002) 29 Cal.4th 228, 251.)

Once a magistrate has issued a commitment order, under section 739 the prosecution may charge in an information "a different but related crime shown by the evidence taken before the magistrate." (*Parks v. Superior Court* (1952) 38 Cal.2d 609, 612.) The crime is related if it arose out of the transaction that was the basis for the magistrate's holding order. (*Jones v. Superior Court* (1971) 4 Cal.3d 660, 665.) The prosecution may charge a related offense even where the magistrate concluded "that the evidence did not show probable cause that such offense had been committed." (*Parks v. Superior Court*, *supra*, 38 Cal.2d at pp. 613-614.)

Consequently, when, as here, a magistrate strikes a special circumstance allegation for lack of sufficient cause, that "does not preclude the prosecutor from later filing an information charging the same matter omitted by the magistrate from the order of commitment." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 653, 657 (*San Nicolas*). "So long as the additional offense was supported by the evidence taken before the magistrate, it may be included in the information—even if the magistrate did not see fit herself to include such offense." (*Id*. at p. 654, fn.8.) In *San Nicolas*, accordingly, our Supreme Court upheld "the reinstatement of the special circumstance allegation, notwithstanding the magistrate's earlier dismissal." (*Id*. at p. 657; see *Ramos v. Superior*

5

*Court* (1982) 32 Cal.3d 26, 35 [where a magistrate dismisses a special circumstance, the People may "file an information under section 739 charging the dismissed matter"].)

When the prosecution files an information that reinstates a special circumstance allegation, the defendant may, as here, file a section 995 motion to set aside the special circumstance, as it can challenge any charge in an information. In reviewing a ruling on such a motion, we directly review the decision of the magistrate, conducting "an independent review of the evidence" and disregarding the ruling of the superior court. (*San Nicolas*, *supra*, 34 Cal.4th at p. 654.) Our review is, however, constrained if the magistrate has rendered findings of fact. (*Slaughter*, *supra*, 35 Cal.3d at p. 638.) Such findings "must be sustained if supported by substantial evidence." (*Id*. at p. 639.) But the magistrate's determination of the lack of probable cause "is reviewed as an issue of law." (*Ibid*.) "Absent controlling factual findings, if the magistrate dismisses a charge when the evidence provides a rational ground for believing that defendant is guilty of the offense, his ruling is erroneous *as a matter of law*, and will not be sustained by the reviewing court." (*Id*. at pp. 639-640; accord *San Nicolas*, *supra*, 34 Cal.4th at p. 654.)

### III.  THE TORTURE-MURDER SPECIAL CIRCUMSTANCE

The magistrate set aside the complaint's charge against Fernandez of the torture-murder special circumstance in section 190.2, subdivision (a)(18).[2] Upon a conviction

---

[2] The magistrate found probable cause to hold Fernandez on the murder charge, a decision not challenged here. Consequently, we do not address whether the evidence supports a charge of first degree murder on a torture-murder theory under section 189, subdivision (a), an issue distinct from whether the evidence supports the torture-murder special circumstance.

for first degree murder, the special circumstance applies if "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) Thus, unlike a charge of first degree murder on a torture murder theory, the special circumstance requires two types of intent: an intent to kill and an intent to torture. (*People v. Edwards* (2013) 57 Cal.4th 658, 718 (*Edwards*); see *ibid.* [torture murder theory of first degree murder does not require intent to kill].)

The torture-murder special circumstance does not require "a causal relationship between the torture and the victim's death." (*People v. Crittenden* (1994) 9 Cal.4th 83, 142.) Rather, it is "intended to encompass . . . acts of torture occurring within a larger time frame, including those that would not have caused death." (*Ibid.*) Rather than causation, it requires "some proximity in time and space between the murder and torture." (*People v. Bemore* (2000) 22 Cal.4th 809, 843 [cleaned up] (*Bemore*).) It applies "where the death involved the infliction of torture, regardless of whether the acts constituting the torture were the cause of death." (*People v. Jennings* (2010) 50 Cal.4th 616, 647 (*Jennings*).)

Fernandez's intent to torture Marco is not in dispute here. Intent to torture is defined as the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. (§ 206.) That intent is shown when "the defendant deliberately inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.)

The dispute here concerns whether there was sufficient evidence before the magistrate to show probable cause that Fernandez "harbored an intent to kill when he tortured" Marco. (*Jennings*, *supra*, 50 Cal.4th at p. 647.) If so, the special circumstance applies, as it also is undisputed here that there is sufficient evidence that the murder "involved" the infliction of the torture. (*Ibid.*)

In explaining that sufficient evidence showed Fernandez harbored an intent to kill when torturing Marco, we will rely on cases that concern the sufficiency of evidence to support a *conviction* (that is, a jury's "true" finding) on the special circumstance because nearly all reported cases on the matter arise in that context. At this stage, though, we are reviewing the *charge* and need not find even the quantum of evidence sufficient to support a jury finding. (*People v. Scully* (2021) 11 Cal.5th 542, 582.) Instead, we are to consider the "low evidentiary bar" of whether "'some rational ground'" supports concluding that Fernandez intended to kill. (*Ibid*. [quoting *San Nicolas*, *supra*, 34 Cal.4th at p. 654].) Under that standard, the evidence presented to the magistrate provided ample support for the alleged torture-murder special circumstance. We see one major reason why this is so, and three additional supporting reasons.

Most importantly, the evidence showed extreme, extensive, and repeated bodily injuries inflicted on a baby. Intent to kill can be shown by inference from the way the perpetrator treated the victim. For instance, in *People v. Gonzales* (2012) 54 Cal.4th 1234, 1274 (*Gonzales*), our Supreme Court held it proper to infer the intent to kill from running bath water hot enough to scald and kill a four-year-old because the defendant

8

"could not have been unaware of the temperature, or the effect it would have on the child."

Gonzales involved a single incident, but similar reasoning also applies to repeated acts of torture over time. Our Supreme Court in *Jennings*, *supra*, 50 Cal.4th at pp. 628-630 held the repeated infliction of serious, life-threatening physical abuse on a child sufficient to support an inference of intent to kill. That is, the "nature of the torture" inflicted on a five-year-old—"the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving [the child] to the point of emaciation"—was "sufficient to suggest" such intent. (*Id*. at p. 647.) In *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201-202 (*Whisenhunt*), as well, the court stated that the methodical infliction of burn wounds on a 19 month old child showed an intent to kill, and "continuing and escalating acts of abuse" showed the "intent to eventually kill" the child. And in *People v. Lopez* (2018) 5 Cal.5th 339, 355 (*Lopez*), the court also relied on continuing and escalating acts of abuse to support an intent to kill and noted the finding was warranted because "the fact that [a victim] was a small toddler, already weakened by several days of extreme abuse" made the defendant aware of her fragility.

The inference of intent to kill here was supported by the immense scope of abuse inflicted on Marco. Allison Hunt, the forensic pathologist who performed the autopsy,

testified, using photos, to dozens of bruises on the baby from "blunt-force injuries."[3]  In addition, she testified that Marco had a "minimum of 18" posterior rib fractures that were at least three to four weeks old.  She stated that it would take "a great deal of force" to cause those.  She also observed that it would have taken a significant amount of force to cause some of his bruising, including a bruise on his diaphragm and the bruises on the soles of his feet.

Hunt also identified various injuries inflicted on Marco's head that resulted from a significant amount of force and from multiple blows over time.  There were multiple skull fractures, including one that spanned five to seven centimeters that consisted of one main fracture and smaller radiating fractures.  She found "significant hemorrhage in multiple areas" of his crown and scalp from "significant blows to the head."  Marco also had hemorrhaging near an ear and near his forehead from separate impacts and a hemorrhage older than the others.  Hunt sent Marco's eyes to an ophthalmic pathologist who found a "severe hemorrhage in the optic nerve" behind the right eye and "numerous retinal hemorrhages" in the left eye.

---

[3] Marco had seven purple-red bruises above his right forehead, bruises on the right side and right back of his head, a bruise on the back left side of his head, a black eye with bruising by his nose, multiple bruises of varying sizes on his torso, a bruise on his hand, bruises on both knees, both legs, and tops of both feet, multiple bruises on the bottom of his feet, multiple bruises on his upper back, four bruises on his middle back, a bruise on his right elbow, abrasions on the back of his hands and fingers, a bruise on the inside of his middle finger, and a large laceration covering the whole frenulum, the area under the skin of his upper lip.

10

Hunt sent Marco's brain and spinal cord to Dr. Cho Lwin, a medical examiner with a specialty in neuropathology. Lwin testified that Marco had suffered multiple blunt force impacts on his brain.[4] Some of these injuries were in the days before death, some sustained earlier.[5] The recent hemorrhages impaired blood flow to the brain, and a blunt force had caused blood to pool in a cavity in the center of Marco's brain where blood was not supposed to be.

Lwin concluded that "[t]he baby died of acute blunt force traumatic brain injury" from a blow severe enough to fracture the left side of his skull, causing a hemorrhage "large enough that [it] caused the brain swelling and death." The force caused "blood flow down through the spinal cord into the spinal cord, and the left side of the brain is swollen larger than the right side of the brain. So that left side injury is the immediate acute cause of death." Because of the type of cells at that hemorrhage, Lwin dated the injury to "within three days, maybe hours, not one hour, I believe."

---

[4] Marco's brain had a subdural hematoma (that is, inside the dura, or outermost layer of protective brain tissue) and an epidural hematoma (outside the dura). There were "actual brain tissue hemorrhages, not just outside on the surface." Lwin associated such injuries with blunt force trauma.

[5] On the one hand, Marco had a hematoma sustained within three days of death in the soft tissue on the back of his head. A hemorrhage on the left side of his brain also occurred within three days, and it matched a skull fracture on that side. There were additional recent brain contusions. On the other hand, Marco had suffered brain injuries even earlier, including hemorrhages in the area above his right ear. Lwin found microscopic evidence that Marco had a brain hemorrhage that had healed for at least a month, and he opined that Marco had a "nonfatal traumatic brain hemorrhage a few weeks before" his death.

These injuries to Marco differed from situations with a single injury, mild injuries, or injuries to an older person. They were a profusion of grave wounds visited upon a baby. Marco suffered all these injuries in the first 13 weeks of life. We have no indication of a cause other than Fernandez. It is rational to infer that a person who, over a few weeks, struck an infant in ways that broke most of his ribs, fractured his skull, wounded his brain recurrently, and induced head-to-toe bruises "could not have been unaware" (*Gonzales*, *supra*, 54 Cal.4th at p. 1274) that death could result from the blows. (See *Edwards*, *supra*, 57 Cal.4th at 718 ["nature of [victim's] injuries" supported intent to kill for special circumstance].) This is a rational ground for concluding that Fernandez intended to kill Marco when torturing him.

Beyond the nature of the baby's injuries, we discern three additional rational grounds that support the conclusion that Fernandez had the intent to kill in torturing Marco.

First, Fernandez had a motive to kill Marco because of his suspicion that he was not his child. Having heard the evidence, the magistrate put it this way: "I think it's clear Mr. Fernandez wanted Marco gone. I think he wanted him dead. I think he wished him dead. I think he prayed for him to be dead." And: "I think he wanted him out of his life." Our Supreme Court has noted that "evidence of motive is often probative of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 741; see also *Lopez*, *supra*, 5 Cal.5th at p. 355 [motive to harm child supported finding of intent to kill].) Fernandez's evident

desire to eliminate Marco from his life supports the inference that his abuse included a desire to kill.

Second, even after Fernandez decided to take Marco to the hospital, he did not proceed with urgency. Fernandez and Flores' initial account caused an emergency room doctor concern about the two-and-a-half hour gap between when they said they left home and when they arrived with a dead baby. Fernandez even stated he took his family through a McDonald's drive-through on the way to the hospital. Fernandez therefore openly acknowledged a lack of concern for getting Marco to the hospital, even though it was obvious that the infant's situation was dire. Though the parents recanted their story that Fernandez dropped Marco while hiking, they did not disclaim Fernandez's insouciance.[6] Delaying care for a critically ailing infant evinces an intent to kill. (See *Whisenhunt*, *supra*, 44 Cal.4th at p. 202 [dissuading parent from seeking medical help for grievously injured child supports an inference of intent to kill]; *Gonzales*, *supra*, 54 Cal.4th at p. 1274 [intent to kill where defendant "did nothing to seek help for" dying four-year-old girl].)

Finally, Fernandez's false stories to the doctors and police provide what the magistrate recognized as "consciousness of guilt." After Fernandez's initial story of

---

[6] Evidence from front desk security at their residence indicated Fernandez and Flores departed with Marco around 3:25 a.m., 43 minutes before they arrived at the hospital at 4:08 a.m. Their residence and the hospital were in the city of Indio, at a distance that the prosecutor argued was "not that long of a ride" and "a matter of minutes." It is not clear why the parents would have initially fabricated a story in which they left home much earlier than they actually did. Regardless, the evidence confirms the inference of nonchalance that Fernandez's initial comments created.

13

falling while hiking with Marco a day or two earlier, Fernandez admitted he had been lying about the hiking fall and switched to an account where the hospital trip was triggered by his shaking Marco at home. That account also can be inferred to be false if the cause of death was a severe blow to the head, as Lwin testified.

Fernandez's false stories—like his motive to kill and his lack of urgency in traveling to the hospital—might not in isolation be sufficient to show Fernandez had the intent to kill when he tortured Marco. But if there is any doubt that Marco's dreadful injuries alone were sufficient, these three grounds confirm that it is rational to infer that Fernandez intended to kill the baby. There may be inferences in Fernandez's favor that could be argued at trial—and of course additional evidence may then be introduced by either side—but because there was "a rational ground for believing" Fernandez had the intent to kill (*Slaughter*, *supra*, 35 Cal.3d at p. 640), the special circumstance was supported by ample evidence, and should not have been dismissed.

## IV. THE RULING AT THE PRELIMINARY HEARING

Nothing in the magistrate's analysis disagreed with the conclusion in section III above that there is a rational ground to conclude that Fernandez harbored an intent to kill Marco when torturing him. Even so, the magistrate set aside the torture-murder special circumstance charge for a legally flawed reason. The magistrate determined that he did not know the "exact mechanism" of Marco's death, so he could not say Fernandez had "an intent to kill at that moment." For the special circumstance, however, the intent at the moment of a blow that causes death is not dispositive, as the "relevant inquiry . . .is

14

whether [Fernandez] harbored an intent to kill when he tortured" Marco. (*Jennings*, *supra*, 50 Cal.4th at p. 647; see *People v. Odom* (2016) 244 Cal.App.4th 237, 249 (*Odom*) [upholding special circumstance based on substantial evidence that the defendant "formed the intent to kill during the beating itself"].)

That is, the special circumstance requires that the defendant had an intent to kill in torturing Marco, but it requires additionally only that the murder itself "involved the infliction of torture." (§ 190.2, subd. (a)(18); *Bemore*, *supra*, 22 Cal.4th at pp. 843-844; *Odom*, *supra*, 244 Cal.App.4th at p. 250 ["torture can consist of a course of conduct and the intent to kill need not be conjoined with every act"].) The intent to kill while torturing, combined with the victim's death in connection with the torture, is enough to make the murder intentional for the special circumstance. The prosecution is not "required to prove that the acts of torture inflicted upon [a victim] were the cause of his death." (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 142.) While the murder and the torture must be related (*Bemore*, at p. 843), there need not be proof of intent to cause death at the instant of the death blow. What this means is that if a person tortures another with the intent that the torture will eventually kill them, they do not escape the special circumstance if the victim dies during the abuse at an unexpected moment or in an unanticipated way—or if, as here, there is no evidence specifically showing intent at the precise moment of the death blow.

*Jennings* illustrates that proof of intent to kill concurrent with the death blow is not required. In *Jennings*, the defendant and his wife, who were abusing and torturing their

15

five-year-old son, gave the severely weakened boy several sleeping pills for what they claimed was the purpose of easing his pain. (*Jennings*, *supra*, 50 Cal.4th at p. 631.) He "died later that day as a result of combined drug toxicity and acute and chronic abuse and neglect." (*Id.* at p. 640.) In upholding the sufficiency of evidence for the torture-murder special circumstance, the Court stated that the focus was not on the parents' "innocuous intent" in giving the boy the sleeping pills that contributed to his death, but on whether the defendant "harbored an intent to kill when he tortured" his son. (*Id.* at p. 647.) That is, the applicability of the special circumstance did not depend on proof of the intent to kill at a particular moment that led to the death. What mattered for the special circumstance was an intent to kill during the torture, and a "close connection between the torture and the murder." (*Id.* at p. 648 [quoting *Bemore*, 22 Cal.4th at p. 843].)

Also illustrative is *Whisenhunt*, *supra*, 44 Cal.4th 174, where an abused baby died after a series of burns and bruises at the hands of the defendant, and the precise death blow was unidentified. The autopsy attributed her death to "internal bleeding in the abdominal cavity," with dozens of "burns and bruises [that] were also contributing factors in her death." (*Id.* at p. 186.) A prosecution expert witness attributed the fatal internal injuries to "at least two blows, possibly more" that may have included kicks and punches. (*Id.* at p. 189.) Our Supreme Court found intent to kill supporting the torture-murder special circumstance based on the circumstances of the torture and killing— especially the "continuing and escalating acts of abuse"—without finding an intent to kill at the instant of any particular blow. (*Id.* at pp. 201-203; see also *People v. Powell*

16

(2018) 5 Cal.5th 921, 931, 947 [where a victim died of "multiple blunt force injuries," holding that evidence including the "extreme nature of the beating" provided "adequate evidentiary support for a finding of intent to kill" to support the special circumstance, without identifying any individual blow that came with that intent].)

The magistrate here recognized that Marco likely died when Fernandez caused a "cracked skull which resulted . . . in death." The magistrate indicated that *if* Fernandez intentionally caused significant force to Marco that cracked his skull, the special circumstance charge would stand: "If it was a direct throw to the floor," the magistrate said, "I think it's over. I don't think there's much to discuss." But because the "exact mechanism" of Marco's death was not established, the magistrate set aside the special circumstance because of lack of proof that Fernandez had "an intent to kill at that moment."

The magistrate thereby required proof that was not needed. As discussed in Section III, above, sufficient evidence supported a charge that depends on Fernandez's intent to kill during his torturing of Marco. There has been no claim that the murder was unconnected to the torture, as it appears to have resulted from the same course of conduct. That is enough to sustain the special circumstance charge.

No proof is required that Fernandez intended to kill at the instant of a particular act that killed Marco. As the People argued to the magistrate, "we can't say what the final blow is" but "when we're looking at the injuries . . . that shows the defendant's intent." Contrary to the magistrate's conclusion, the evidence at the preliminary hearing

17

provided probable cause to charge Fernandez with the torture-murder special circumstance.[7]

The Superior Court judge, in contrast to the magistrate, concluded that at the preliminary hearing the People "had presented sufficient evidence for a holding order" on the special circumstance. But it believed it was not permitted to "substitute[e] [its] judgment as to the weight of the evidence" for the magistrate's judgment in reviewing the reinstated charge.

This restraint was unwarranted and in fact undersold the trial court's responsibility to conduct "an independent review of the evidence." (*San Nicolas*, *supra*, 34 Cal.4th at p. 654.) The magistrate's determination of the lack of probable cause "is reviewed as an issue of law" and is erroneous as a matter of law if the evidence provides "a rational ground for believing that defendant is guilty of the offense." (*Slaughter*, *supra*, 35 Cal.3d at pp. 639-640; *People v. Leon* (2015) 61 Cal.4th 569, 596 ["the prosecution may challenge the magistrate's legal conclusion that the evidence was insufficient to show that the charged offense occurred. [Citations.]"; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 545-546 [magistrate "makes a legal conclusion when it accepts the prosecution's evidence, but determines there is insufficient evidentiary support for one or

---

[7] We note that CALCRIM 733, the jury instruction applicable to the torture-murder special circumstance, includes the element that the defendant intended to kill, and its notes explain that causation is not required. We think this case suggests that it would be helpful for the commentary to the instruction to also refer to the authority discussed above establishing that the accused's intent to kill must be "when he tortured" the victim, and not necessarily at the moment of a particular fatal blow. (*Jennings*, *supra*, 50 Cal.4th at p. 647.)

more elements of a charge"].)  We see no factual finding by the magistrate that requires deference, and Fernandez's response to the People's petition does not identify one.  (See *People v. Superior Court (Mendez)* (2022) 86 Cal.App.5th 268, 277-278.)

The trial court could have properly reinstated the special circumstance as it wished to do.  With the same review power, we order it to do so now.

## V.  DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing the respondent court to (1) set aside its November 22, 2021 order granting the motion filed pursuant to Penal Code section 995 and thereby striking the torture-murder special circumstance allegation and (2) issue a new and different order denying the motion.

CERTIFIED FOR PUBLICATION


RAPHAEL
                                                                                        J.


I concur:

MENETREZ
                            J.


19

*The People v. Superior Court of Riverside County;* (*Leonardo Fernandez*), E078405

Ramirez, P. J., Dissenting

Although I agree there is no dispute on the element of intent to torture, I disagree with the majority that an intent to kill was manifest, particularly where the magistrate determined there was an absence of such intent. When all is said and done, the magistrate found that the only agency to which the death was attributable was committed in a way in which it could not find there was an intentional killing. No matter how you slice it, the magistrate made the finding on this essential element of the special circumstance allegation.

An intentional killing is a necessary prerequisite to a torture murder special circumstance allegation. I think we are all in agreement on this point but applying a tortured analysis of the standard of review is not a substitute for a magistrate's finding of fact on an essential element of a special circumstance allegation. The torture-murder special circumstance "'requires proof of first degree murder (§ 190.2, subd. (a)), proof the defendant intended to kill and to torture the victim (§ 190.2, subd. (a)(18)), and the infliction of an extremely painful act upon a living victim.'" (*People v. Leach* (1985) 41 Cal.3d 92, 110, quoting *People v. Davenport* (1985) 41 Cal.3d 247, 271.) "'The torture-murder special-circumstance allegation requires an "'intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.'" [Citation.] Unlike torture murder, it also requires an intent to kill . . . .' [Citations.]" (*People v. Dalton* (2019) 7 Cal.5th 166, 216.)

1

The majority rely on a quartet of cases purportedly supporting its conclusion—contrary to the magistrate's finding—that defendant tortured the infant with the requisite intent to kill. Indeed, I disagree with the statement by the majority that intent to kill can be shown by inference from the way the perpetrator "treated the victim." (Maj. opn., p. 8) This statement, unsupported by citation to authority, is plainly incorrect and invites speculation. While defendant's intent to torture may be inferable from the abusive manner in which he treated the victim, it is a bridge too far to say it evinces an intent to kill, absent the commission of acts likely—or intended—to cause death. Moreover, consciousness of guilt (maj. opn., p. 14), inferable from defendant's various false statements regarding the cause of the child's injuries, is not a proxy for intent to kill.

It is in this manner that the decisions relied upon by the majority as support for its determination that an inference of intent to kill could be drawn demonstrate a logic gap. In each case, the defendant committed an act likely to produce death. For example, in *People v. Gonzales* (2012) 54 Cal.4th 1234, 1274, the Supreme Court held the intent to kill could be inferred from running bath water hot enough to scald and kill a four-year-old where the defendant was aware of the temperature and the effect it would have on the child.

In *People v. Jennings* (2010) 50 Cal.4th 616, the child was killed by a blow to the back of the head with a shovel. However, leading up to the death, the evidence showed defendant administered Unisom, an over-the-counter sleep aid, as well as Vicodin and Valium, both prescription painkillers that had been prescribed to defendant for a work-

2

related injury, to the child, with full knowledge that such conduct endangered the child's life based on his emaciated and malnourished condition. In addition, injuries to the child's face indicated he was smothered shortly before dying. (*Id.,* at pp. 632, 634.) In addition, the defendant physically abused the child continuously, starved the child, had commented that the child would not be around for long, and that "he had to finish [Arthur] off," or shoot him, or otherwise kill him. (*Id.,* at pp. 631, 646.)

The court observed that the nature of the torture inflicted upon Arthur—the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving Arthur to the point of emaciation—was sufficient to suggest that defendant had the intent to kill. (*Jennings, supra*, 50 Cal.4th at p. 647.) In other words, the intent to kill was established by evidence of the defendant's expressed intent to kill coupled with a series of life-threatening abusive acts.

The majority also liken this case to that of *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201-202, but here again, the analogy fails. In *Whisenhunt,* defendant committed escalating acts of abuse that showed his premeditated and deliberate intent to eventually kill the victim. On the day of the murder, defendant brutally kicked or punched the 19-month old victim, and, after she was incapacitated, he methodically poured hot cooking oil onto various portions of her body, repositioning her body so as to inflict numerous burns throughout her body, including her genital region. (*Id.,* at p. 201.) The child died of internal injuries inflicted by means of severe blows to the abdomen, and third degree burns. (*Id.,* at p. 186.) The court concluded defendant's actions after he inflicted the

3

fatal wounds also supported the inference that he deliberately intended to kill the child because, after inflicting the grievous injuries, defendant initially dissuaded the mother from seeking medical help by lying to her about the nature and extent of the child's injuries, and then actively prevented her from calling 911 until after the child's death.

Other than a delay in seeking medical treatment for the child in the present case, there were no *inflicted* injuries that in and of themselves were life threatening, save the head injury apparently sustained within three days of the infant's death. The only *evidence* as to the agency that led to the baby's death in this case is the testimony that defendant threw the child onto a bed, after which the baby fell on the floor. It cannot be said that the defendant's act of throwing the child on a bed was a life-threatening act, or that a reasonable person would appreciate that throwing a child on a bed would result in death.

The last case relied upon by the majority as supporting the inference defendant had an intent to kill is *People v. Lopez* (2018) 5 Cal.5th 339, which is also distinguishable. In that case, the defendant sexually abused the toddler, such that her genitalia "was ripped and torn" from her vaginal opening to her anus. She also suffered a large skull fracture to the back right side of her brain, indicating "very significant" blunt trauma to the head, which likely occurred on the day she was brought into the emergency room. (*Id.,* at p. 348.) There was testimony that on the night before the child died, defendant threw her onto the floor, cracking her skull, and, the next day, tried to prevent others from seeking medical care for the child. (*Id.,* at p. 355.) The Supreme Court

4

reasoned that "[a] deliberate intention to kill was supported by the fact that [the child] was a small toddler, already weakened by several days of extreme abuse, when [defendant] lifted her over his head and threw her to the ground." (*Ibid*.)

The common thread in these cases points up the false analogy to the present case. There is no debate defendant tortured the baby with continuing pain-inducing acts. And while the magistrate "inferred" the defendant wished the baby dead, there is no evidence of any such state of mind expressed by the defendant, such as is present in each of the cases relied upon by the majority. Further, in each of the cases cited by the majority as support for an inference of intent to kill, the defendant committed an intentional act known to be life threatening to the child. In the present case, the only act described in evidence was the act of throwing the child onto a bed, after which the child fell or rolled onto the floor. Without the commission of an intentional act likely to produce death, inferring an intent to kill from the act of throwing the child on the bed is engaging in sheer speculation.

The magistrate concluded that no intent to kill could be inferred from the act of throwing a child onto a bed, in rejecting the torture murder special circumstance. In the total absence of evidence to the contrary, it is not our place to infer different facts. I agree the evidence supports the magistrate's finding that a public offense has been committed, and there is sufficient cause to believe that the defendant is guilty. (Pen. Code, § 872, subd. (a).) I even agree that the crimes to this young infant were horrendous and that defendant harbored the intent to torture. But I disagree with the notion that we

5

can disregard a magistrate's factual finding to reach a different conclusion that the killing was intentional in the total absence of evidence to support that element.

RAMIREZ     
P. J.